[Cite as *Whitman v. Whitman*, 2012-Ohio-405.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

JUSTIN P. WHITMAN,

    PETITIONER-APPELLEE,          CASE NO. 5-11-20

    v.

JEFFREY WHITMAN,              O P I N I O N

    RESPONDENT-APPELLANT.

**Appeal from Hancock County Common Pleas Court**
**Probate Division**
**Trial Court No. 20074002A**

**Judgment Affirmed**

**Date of Decision: February 6, 2012**

APPEARANCES:

    *Dennis M. Fitzgerald* **for Appellant**

    *Keith L. Faber and Michael E. Gilb* **for Appellee**

Case No. 5-11-20

**SHAW, P.J.**

{¶1} Respondent-appellant, Jeffrey J. Whitman ("Jeffrey"), appeals the July 1, 2010 judgment of the Hancock County Court of Common Pleas, Probate Division, finding him in civil contempt and sentencing him to serve three days in jail as a civil contempt sanction. Jeffrey also appeals the April 7, 2011 judgment of the same court ordering him to pay as an additional contempt sanction the attorney fees of petitioner-appellee, Justin P. Whitman ("Justin"), in the amount of $104,128.57.

{¶2} Justin is the adult son of Jeffrey. Jeffrey is a licensed attorney in the State of Ohio. Justin initiated this case in 2007 when he filed a petition for an accounting, alleging that Jeffrey, as Custodian and Trustee on certain accounts belonging to him, had failed or refused to provide him with an accounting of these funds as required by R.C. 5814.04 and R.C. 2109.303.[1] Justin requested the trial court to order Jeffrey to provide an accounting for the following four sources of funds.

---

[1] The record indicates that prior to filing this petition, Justin asked Jeffrey to authorize the brokerage firms managing these funds to release account statements to him for his inspection. Jeffrey refused to allow Justin to have access to this information. Justin subsequently filed two lawsuits, one in Lucas County and one in Allen County, to forcibly obtain this information from the brokerage firms. In both instances, Jeffrey attempted to intervene in the lawsuits, but was unsuccessful. As a result of these suits, Justin was given full access to information regarding these funds.

-2-

### 1. The UGMA/UTMA Accounts

{¶3} The record demonstrates that between 1984 and 1994 Jeffrey established several custodial accounts in Justin's name pursuant to the Uniform Gift to Minors Act ("UGMA") and the Uniform Transfer to Minors Act ("UTMA") and listed himself as the Custodian of these funds. Under these Acts, a minor can have money, securities, and other property invested in his or her name with the custodian having a fiduciary responsibility for managing the funds in the accounts prudently. Once the funds are placed into these accounts it is considered an irrevocable gift and conveys to the minor indefeasibly vested legal title to the funds. At the time the minor attains the age of 21, he or she is no longer considered a minor for the purpose of these accounts and has complete rights to the funds in the accounts. See R.C. Chapter 5814. Justin turned 21 on January 26, 2005.

### 2. The College Fund Trust

{¶3} On May 17, 2000, Jeffrey established the College Fund Trust. It is undisputed by the parties that this trust is comprised entirely of custodial funds belonging to Justin. Jeffrey established this trust to pay for expenses related to Justin's higher educational pursuits.

*3. The Revocable Trust*

**{¶4}** On May 23, 2000,[2] Jeffrey established the "Revocable Trust" naming Justin as beneficiary and himself as Trustee. At all relevant times in these proceedings, Jeffrey has asserted that the Revocable Trust was funded entirely with his own personal money that he set aside for estate planning purposes; that the Revocable Trust did not contain any custodial funds belonging to Justin and was revocable at any time. In 2004, Jeffrey revoked this trust and transferred the funds totaling $124,149 into his own personal trust, for which he is named as both trustee and beneficiary.

*4. The Grandfather Trust*

**{¶5}** The Grandfather Trust was established in 1999 pursuant to the last will and testament of Jeffrey's father, John P. Whitman. This trust was created for Justin's benefit and named Jeffrey as Trustee.

**{¶6}** On July 21, 2008, the parties appeared for a hearing on Justin's petition for an accounting. Jeffrey provided testimony regarding each of the trusts. Based on the evidence adduced at the hearing, the trial court found that Justin was

---

[2] The report filed by the forensic accountant in this case indicates that this trust was established on May 23, 2000. The trust document submitted by Jeffrey indicates that this trust was established on January 5, 2002. However, the precise date of this trust's creation is not relevant to the ultimate resolution of this case.

entitled to an accounting of the UGMA/UTMA accounts, the College Fund Trust, the Revocable Trust, and the Grandfather's Trust. On the record, the trial court ordered Jeffrey to file an accounting of the College Fund Trust within thirty days of the hearing, and to file an accounting of the UGMA/UTMA accounts, the Revocable Trust and the Grandfather's Trust within sixty days of the hearing. The trial court journalized its findings in its August 15, 2008 Judgment Entry and specified that the accounting shall include "a statement of debits and credits and as the term 'accounting' is generally applied in terms of a fiduciary accounting in probate court." (JE Aug. 15, 2008 p.3). See R.C. 2109.303.

{¶7} On September 16, 2008, Justin filed a motion for contempt with the trial court, alleging that Jeffrey failed to comply with the August 15, 2008 order because he did not submit an accounting for the College Fund Trust within the thirty-day time frame ordered by the court. Three days later, on September 19, 2008, almost one month past the thirty-day deadline set by the trial court for the College Fund Trust, Jeffrey filed a signed, two-page document with the trial court labeled "Accounting."

{¶8} In this document, Jeffrey provided a short summary paragraph for each account and attached over forty pages of documents, which consisted of statements issued by the financial entities holding the funds contained in the

College Fund Trust, the Revocable Trust, and Grandfather's Trust, letters written by representatives of these entities, and a two-page document signed by Jeffrey, as both the preparing attorney and trustee, which itemized fourteen "disbursements" from the College Fund Trust for Justin's benefit over a period of six years. In this "Accounting," Jeffrey provided no information about the UGMA/UTMA accounts, stating only that those funds were now contained in the College Fund Trust.

{¶9} On November 4, 2008, Justin filed a "Supplement to Motion in Contempt Coupled with Motion to Strike 'Accounting' and Motion to Conduct an Investigation." In this motion, Justin alleged that Jeffrey had failed to comply with the August 15, 2008 order because his September 19, 2008 "Accounting" was insufficient to constitute an adequate accounting for any of the trusts under R.C. 2109.303.

{¶10} On November 7, 2008, the trial court conducted a hearing on Justin's motions for contempt. After a discussion on the record between the trial court and the parties, Jeffrey conceded that his first accounting was inadequate to comply with the statute because it was not in the proper format showing all initial account deposits, all transaction history, including debits and income credits, and the balances after each transaction. At the hearing, Justin agreed to continue the

contempt proceedings to allow Jeffrey a second opportunity to comply with the August 15, 2008 order by filing an accounting sufficient under R.C. 2109.303. The trial court gave Jeffrey fourteen days to resubmit an accounting with all the necessary information in the appropriate format.

{¶11} On November 26, 2008, Jeffrey filed a supplemental accounting entitled "Trust Report" for the College Fund Trust, the Revocable Trust, and the Grandfather's Trust. This time, Jeffrey provided more detail regarding the transactions for each account, including the beginning and end balances as well as descriptions of several transactions affecting the balances in each account. The "Trust Reports" also contained a running balance after each transaction. Again, Jeffrey provided no information about the UGMA/UTMA accounts, but instead attached an affidavit insisting that he had no records for these accounts prior to 2000 and that his first ex-wife, Justin's mother, possessed many of these documents.

*A. Contempt Proceedings*

{¶12} On December 15, 2008, and January 9, 2009, the trial court conducted hearings on Justin's contempt motions. Jeffrey provided the majority of the testimony. Jeffrey admitted that he initiated the UGMA/UTMA accounts between 1984 and 1994, but insisted that he had no records for these accounts

prior to 2000. However, there was evidence before the trial court that Justin's counsel had obtained records for the UGMA/UTMA accounts, which dated as far back as 1994 and were accessible to Jeffrey. Nevertheless, Jeffrey continued to blame Justin's mother, who he claimed kept these records from him. However, there was no evidence that Jeffrey attempted to procure these documents from her.

{¶13} On cross-examination, Justin's counsel presented evidence relating to the College Fund Trust, which revealed numerous discrepancies between Jeffrey's supplemental accounting and the records maintained by Edward Jones, the brokerage firm handling the College Fund Trust. In particular, there were several withdrawals documented on the brokerage account statements which did not appear in Jeffrey's supplemental accounting. Jeffrey admitted that at times he would reimburse himself out of the College Fund Trust in lump sums for expenses he claimed to have paid for Justin's benefit out of his own personal funds. He testified that he had no contemporaneous documentation explaining these reimbursements and that he simply would make a verbal request to his broker to withdraw the money. Jeffrey's broker at Edward Jones also testified confirming that Jeffrey made several verbal requests for withdrawals from the account.

{¶14} As for the Revocable Trust, Jeffrey continued to maintain that even though Justin was the named beneficiary for four years that Jeffrey was still

entitled to revoke the trust at any time because it was funded with his personal money, as opposed to the College Fund Trust, which contained custodial money.

{¶15} After the two days of testimony, the trial court reached its decision on whether Jeffrey was in contempt for failing to comply with its August 15, 2008 order.

{¶16} The trial court found that Jeffrey's accounting and supplemental accounting relating to the Grandfather's Trust were sufficient to comply with the statute and its order. Therefore, Jeffrey was not in contempt regarding this account.

{¶17} As for the Revocable Trust, the trial court initially found Jeffrey in contempt because his first accounting was insufficient. However, the trial court determined that Jeffrey's supplemental accounting "substantially complied" with the statute and its order. Therefore, the trial court concluded that Jeffrey had purged his contempt with respect to the Revocable Trust. In reaching its conclusion, the trial court relied heavily on Jeffrey's statements that the Revocable Trust was funded solely with his own personal money, entitling him to revoke the trust in 2004.

{¶18} The trial court found Jeffrey's accounting and supplemental accounting of the College Fund Trust and the UGMA/UTMA accounts to be more

problematic.  The trial court was not persuaded by Jeffrey's defense of impossibility of performance to produce an accurate accounting of the UGMA/UTMA accounts.  Accordingly, the trial court found Jeffrey in civil contempt for failing to properly account for these funds.

{¶19} As for the College Fund Trust, the trial court found that both Jeffrey's initial accounting and his supplemental accounting were insufficient to comply with the August 15, 2008 order.  The trial court found particularly troublesome the omission of numerous withdrawals in Jeffrey's supplemental accounting.  Accordingly, the trial court found Jeffrey in civil contempt for failing to provide an adequate accounting of the College Fund Trust.

{¶20} The trial court then granted Justin's motion to conduct an investigation of the College Fund Trust and UGMA/UTMA accounts and appointed a forensic accountant to construct an accounting of these funds.  The trial court ordered Jeffrey to pay the cost of the investigation and the accounting. The trial court also ordered Jeffrey to pay all reasonable costs and attorney fees incurred by Justin in the filing and prosecution of the contempt, with the total amount to be determined at a later hearing after the forensic accountant completed the investigation and accounting.

**{¶21}** The trial court reserved imposing contempt sanctions for a later date to allow Jeffrey an opportunity to purge its findings of civil contempt. In particular, the trial court ordered Jeffrey to fully and promptly cooperate with the forensic accountant in the review and investigation, "including providing any authorizations, testimony, information or other items necessary to the same." (JE Feb. 17, 2009 at 6).

**{¶22}** The trial court warned Jeffrey that his cooperation and compliance would be considered when determining whether he had sufficiently purged its contempt findings. On the record, the trial court specifically issued the following notice to Jeffrey. "I will caution you, Mr. Whitman, that the fact that you're an attorney is not going to save you from jail if this doesn't come out to be right. Whether you're an attorney or a dad or not, one of the punishments under contempt is jail." (Tr. at 669).

**{¶23}** On March 18, 2009, Jeffrey filed a notice of appeal to this Court, appealing the trial court's findings of civil contempt. However, this Court dismissed the appeal, concluding that the trial court's order was not a final order because the amount of attorney fees and the costs associated with the forensic accountant were to be determined at a later date and remained unresolved.

**{¶24}** Discovery in the case continued with the forensic accountant's investigation into the administration of the UGMA/UTMA accounts and the College Fund Trust. On February 22, 2010, the forensic accountant's report was filed with the court and the parties were furnished with their respective copies.

*B. The Purging Determination*

**{¶25}** On April 30, 2010, the trial court held a hearing to determine whether Jeffrey had purged himself of the contempt regarding the UGMA/UTMA accounts and the College Fund Trust. Michelle McHale-Adams, the forensic accountant who conducted the investigation and created the accounting, testified at the hearing.

**{¶26}** McHale-Adams testified that the College Fund Trust was comprised of the proceeds of four UGMA/UTMA accounts in Justin's name, totaling $138,844. In the time period spanning between June 25, 2003 and July 20, 2006, $61,311 was transferred out of the College Fund Trust. McHale-Adams testified that she was unable to determine the purpose of these transactions from the financial documents and that she did not receive any information from Jeffrey explaining why these transactions had occurred.

**{¶27}** Jeffrey provided testimony attempting to explain the $61,311 in withdrawals and transfers from the College Fund Trust identified by McHale-

Adams. Specifically, Jeffrey admitted as exhibits several personal documents, some handwritten, providing justification for some of the withdrawals and transfers out of the College Fund Trust. These exhibits purportedly demonstrated that most of transactions were made for Justin's benefit and were related to his education. However, Jeffrey never shared these documents with McHale-Adams, despite being ordered by the trial court to fully cooperate with her in creating the accounting. Notably, all the resources used by McHale-Adams were provided by Justin's counsel and obtained through discovery. Jeffrey failed to assist McHale-Adams in any way during the investigation and the accounting of the funds.

{¶28} McHale-Adams noted that when she initially embarked on the task of creating this accounting, she was only asked to analyze the funds in the College Fund Trust and in the UGMA/UTMA accounts titled in Justin's name. She noted that, at the time, it was understood that no custodial funds were used to fund the Revocable Trust. However, as she began to delve into the history of the UGMA/UTMA accounts, she discovered that $65,085 of Justin's custodial money had been placed into the Revocable Trust. This was the largest lump sum of funds deposited into the Revocable Trust. Because custodial funds belonging to Justin were used to fund the Revocable Trust, McHale-Adams also conducted an investigation of the Revocable Trust and created an accounting of those funds.

{¶29} Jeffrey claimed that he did not know the funds in the Revocable Trust were custodial in nature and argued that the accounts must have been "mislabeled." However, Justin's counsel admitted into evidence several documents which proved that Jeffrey was the Custodian on these particular UGMA/UTMA accounts prior to them being liquidated and deposited into the Revocable Trust.

{¶30} In addition to the custodial funds, McHale-Adams found two W-2s issued to Justin by Jeffrey's Title Company, purporting to reflect income paid to Justin as an employee. According to these W-2s, Justin was paid $25,000 in wages and received $18,487.50 in income, after taxes, from the Whitman Title Security, Inc., in 2001 and 2002. Coincidentally, two deposits were made into the Revocable Trust in the amounts of $18,488 at the end of 2001 and 2002. Jeffrey admitted that Justin never worked for his title company and that he issued those W-2s solely upon the recommendation of his accountant.

{¶31} Notably, Jeffrey stipulated that Justin was entitled to the funds remaining in the College Fund Trust and that, to the extent the funds in the Revocable Trust were proven to belong to Justin, Justin was also entitled to those funds. In fact, after McHale-Adams' testimony, it became clear that the entire corpus of the Revocable Trust was comprised of funds belonging to Justin and,

Case No. 5-11-20

therefore, Jeffrey was not entitled to revoke the trust in 2004 and place the funds

into his own personal trust account.

**{¶32}** After hearing the testimony and reviewing the exhibits presented, the

trial court was deeply troubled by the facts that had been elicited. Specifically, the

trial court made the following comments about what had transpired at the hearing.

> **What I've seen here is just outrageous, Mr. Whitman. I know it's your son, but you have to be held to the same standards as any other fiduciary.**
>
> **Your lack of records, your lack of cooperation—even until today your answers on your questions, your not knowing answers.**
>
> **The way you framed your answers, I'm not sure. It's the best of my recollection or feigning that you don't remember questions that you should know.**
>
> **I barely believed anything you said. Your cooperation with the [forensic accountant], you didn't give [her] anything. And your attorney's complaining it's one-sided. [You] didn't give [her] anything.**
>
> **You taking money-I believe this sham transaction of paying your son $25,000 for two years of not working, in my mind, that's tax evasion, not avoidance. That's clearly wrong, and then putting it in your name. I do believe that the IRS has some reason to look into this. I'm not saying that they should, but your whole conduct here is certainly subject to question.**
>
> **All this money, that, up 'till now, [you] said was yours and revocable, it appears to me, none of it is.**

**So how can I put any stock into what you say, so how can I give you any benefit in this case. You don't do anything—you come in here and you say, I'll sign a release. I'll give them my records.**

**It's your job. It's your job to show them. It's your job to structure, to show an account and what went out and what went in and what's on hand so that they can come into an accounting and ask that it be objected to, and you haven't done it.**

**Just absolutely no cooperation.**

**And the million dollar question is, what do I do on sentencing? It is difficult. I consider you an officer of the court and a father and the standard there is very high and you have violated every one of them.**

(Tr. at 1061-62).

**{¶33}** On July 1, 2010, the trial court entered its judgment on the case. In its judgment entry, the trial court found Jeffrey in civil contempt for failing to account for the UGMA/UTMA accounts and College Fund Trust. The trial court withdrew its previous finding that Jeffrey had purged himself of civil contempt with regard to the Revocable Trust, now finding him in civil contempt for failing to adequately account for the funds held that trust. The trial court ordered Jeffrey to pay $35,448.75 for the forensic accountant's fees and sentenced Jeffrey to serve three days in jail, as sanctions for his contempt. The trial court also ordered Justin to "recover of [Jeffrey] reasonable attorney fees and costs incurred by [Justin]; and that a hearing be set by the Court to establish the same." (JE Jul. 1, 2010 p.7).

{¶34} The trial court awarded Justin the funds remaining in the College Fund Trust, $47,000, and ordered Jeffrey to deliver the funds previously held in the Revocable Trust to Justin, which at the time of the hearing totaled $168,340.[3] Both Justin and Jeffrey appealed the July 1, 2010 Judgment Entry of the trial court. However, this Court also dismissed that appeal because the award of attorney fees had yet to be resolved.

{¶35} On December 20, 2010, the trial court held a hearing on the attorney fees issue. On April 7, 2011, the trial court awarded Justin $104,128.57 in attorney fees.

{¶36} Jeffrey now appeals, asserting the following assignments of error.

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN FINDING APPELLANT JEFFREY WHITMAN IN CIVIL CONTEMPT OF COURT.**

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED IN SENTENCING APPELLANT JEFFREY WHITMAN TO SERVE THREE DAYS IN JAIL FOR CIVIL CONTEMPT.**

---

[3] There were no withdrawals made from these funds while they were wrongfully contained in Jeffrey's personal trust account. The funds were continuously invested and fluctuated due to market activity.

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN AWARDING ATTORNEY'S FEES TO APPELLEE.**

*First Assignment of Error*

**{¶37}** In his first assignment of error, Jeffrey maintains that the trial court erred when it found him in civil contempt for failing to provide an accounting for the College Fund Trust and UGMA/UTMA accounts and when it withdrew its prior finding that Jeffrey had purged himself of contempt regarding the Revocable Trust and found him in civil contempt for also failing to account for those funds.

**{¶38}** Contempt results when a party before a court disregards or disobeys an order or command of judicial authority. *First Bank of Marietta v. Mascrete, Inc.*, 125 Ohio App.3d 257, 263, 708 N.E.2d 262 (4th Dist.1998); see R.C. 2705.02. "It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55, 271 N.E.2d 815 (1971), paragraph one of the syllabus. The law surrounding contempt was created to uphold and ensure the effective administration of justice, secure the dignity of the court, and affirm the supremacy of law. *Cramer v. Petrie*, 70 Ohio St.3d 131, 133, 1994–Ohio–404, 637 N.E.2d 882. When reviewing a finding of contempt, an

appellate court applies an abuse of discretion standard. *State ex rel. Ventrone v. Birkel*, 65 Ohio St.2d 10, 417 N.E.2d 1249 (1981).

{¶39} In the case sub judice, the trial court found Jeffrey in civil contempt for his failure to file an adequate accounting as required by its August 15, 2008 order. Civil contempt is remedial or coercive in nature and will be imposed to benefit the complainant. *Pugh v. Pugh*, 15 Ohio St.3d 136, 139, 472 N.E.2d 1085 (1984). Although not expressly stated by the trial court, the record supports characterizing Jeffrey's contempt as indirect, which involves behavior that occurs outside the presence of the court and demonstrates a lack of respect for the court or its lawful orders. *Sansom v. Sansom*, 10th Dist. No. 05AP-645, 2006-Ohio-3909, ¶ 23.

{¶40} The trial court specified in its August 15, 2008 order that "[Jeffrey] file an accounting including a statement of debits and credits as the term 'accounting' is generally applied in terms of a fiduciary accounting in a probate court." (JE Aug. 15, 2008 at 3). Jeffrey does not dispute that he acted as a fiduciary with respect to these accounts held for Justin's benefit.

{¶41} Section 2109.303 of the Revised Code provides fiduciaries with guidance on how to construct an accounting and states, in relevant part:

**Every account shall include an itemized statement of all receipts of the \* \* \* fiduciary during the accounting period and of all disbursements and distributions made by \* \* \* the fiduciary during the accounting period. The itemized disbursements and distributions shall be verified by vouchers or proof, except in the case of an account rendered by a corporate fiduciary subject to section 1111.28 of the Revised Code. In addition, the account shall include an itemized statement of all funds, assets, and investments of the estate or trust known to or in the possession of the fiduciary at the end of the accounting period and shall show any changes in investments since the last previous account.**

**\* \* \***

**Upon the filing of every account, the \* \* \* fiduciary, except a corporate fiduciary subject to section 1111.28 of the Revised Code, shall exhibit to the court for its examination both of the following: the securities shown in the account as being in the hands of the \* \* \* fiduciary, or the certificate of the person in possession of the securities, if held as collateral or pursuant to section 2109.13 or 2131.21 of the Revised Code; and a passbook or certified bank statement showing as to each depository the fund deposited to the credit of the estate or trust \* \* \*.**

{¶42} On appeal, Jeffrey argues that the trial court abused its discretion when it found him in civil contempt because no principal was missing from the UGMA/UTMA accounts, the College Fund Trust and the Revocable Trust and all the funds were identifiable and traceable. Jeffrey also claims that the trial court's finding of contempt was arbitrary and unreasonable because its decision was a "rush to judgment."

{¶43} In making this argument, Jeffrey demonstrates a failure to understand the objectives set forth by the trial court in its August 15, 2008 order.  This appears to be due to either: 1) his continued inability to understand the fundamentals of a fiduciary's responsibilities or; 2) his utter disregard for the duties that he imposed upon himself by electing to be the Trustee and Custodian of these accounts.  The following excerpt from a conversation between the trial court and Jeffrey at the contempt hearing on January 9, 2009, seems to support the latter conclusion.

> **Trial Court:  You're an attorney, licensed in Ohio, correct?**
>
> **Whitman: Yes.**
>
> **Trial Court:  And you've been so how long?**
>
> **Whitman:  31 years.**
>
> **Trial Court:  And do you do any probate work?**
>
> **Whitman:  I do some but I've never done any trust accounting.**
>
> **Trial Court:  Have you ever done an accounting in a probate estate?**
>
> **Whitman:  On an estate?  Yes.**
>
> **Trial Court:  And it is your understanding that you start with an inventory balance or a given balance and you show all additions and all deductions from the account?**

**Whitman: Oh, sure.**

**Trial Court: And you come up with a balance, which is then certified by the bank or the trust fund account holder, Edward D. Jones, showing that that's the actual amount.**

**Whitman: Correct.**

(Tr. at 519-20).

**{¶44}** In addition, the trust agreement establishing the College Fund Trust, which Jeffrey personally drafted, states the following, in pertinent part, under Article IV entitled "Rights, Power and Duties of the Trustee," paragraph 13 labeled "Accounting."

**The Trustee shall keep adequate books of account in which shall be entered a description of all property from time to time constituting the assets of each trust and an account of all receipts and disbursements hereunder, which books of account shall at all reasonable times be open to the inspection and examination of the respective beneficiaries * * *. The Trustee shall furnish the respective beneficiaries * * * as often as may reasonably be requested, an accurate statement showing the property constituting the assets of each trust and the income thereof, and showing all receipts and disbursements.[4]**

**{¶45}** The instant case was initiated by Justin filing a petition for an accounting. Accordingly, the primary issue before this Court is simply whether

---

[4] Notably, when Jeffrey was asked about this portion of the trust agreement he responded: "You know, this was a just standard form trust agreement that I whipped out and put something on it. But, you know, I never expected pursuant to this agreement * * * that there would be any accounting." (Tr. at 489).

Jeffrey fulfilled his fiduciary duty to provide Justin with an adequate accounting of the funds belonging to him. The issue of any misappropriation of these funds is an entirely separate matter that Justin chose not pursue at this time. Therefore, the fact that there is apparently no principal missing from the trusts and that the funds are traceable and identifiable is completely irrelevant to the trial court's consideration of whether Jeffrey should be held in contempt for failing to provide an adequate accounting of the funds.

{¶46} As demonstrated by his own testimony, Jeffrey purports to understand what constitutes an accounting in its simplest form. Moreover, the trial court even permitted Jeffrey to explain the debits and credits without attaching any supporting evidence, such as receipts, invoices and vouchers, as required by the statute and the trust document establishing the College Fund Trust. The trial court gave Jeffrey ample opportunity to accomplish this task, even allowing him to resubmit the accounting after it was explained to him why his first attempt was inadequate. Nevertheless, Jeffrey continued to provide various excuses, primarily in the form of blaming his attorneys, ex-wives, brokers and accountant, for why he could not produce an accounting that complied with the trial court's order.

{¶47} Upon finding Jeffrey in civil contempt, the trial court gave him one final opportunity to demonstrate a good faith compliance with the trial court's

order. The trial court did not order him to make a third attempt to file an adequate accounting, but simply ordered him to fully cooperate with the forensic accountant in completing that task. It took the forensic accountant over a year to finish the accounting ordered by the trial court. In that time, Jeffrey offered absolutely no assistance to the forensic accountant. Instead, he arrived at the purge hearing with personal documents that purported to explain some of the transactions relating to the College Fund Trust, documents that the forensic accountant testified would have been helpful in creating an accurate accounting for the trial court.

{¶48} However, the most egregious fact revealed by the forensic accountant is that the Revocable Trust was comprised of entirely Justin's funds. Jeffrey had previously convinced the trial court that the Revocable Trust contained only his personal funds and that he was entitled to revoke it in 2004. The trial court relied on Jeffrey's representations in finding that he had purged himself of contempt regarding this trust. Had it not been for the accounting compiled by the forensic accountant, the trial court and Justin would have never known that these funds were in fact an irrevocable gift and Justin's indefeasibly vested property.

{¶49} Based on the foregoing, there is an overwhelming amount of clear and convincing evidence in the record of this case, for this Court to conclude that the trial court did not abuse its discretion in finding Jeffrey in indirect civil

contempt of court. It is evident from the proceedings that Jeffrey had ample opportunity to both comply with the trial court's August 15, 2008 order and to purge himself of any contempt. Accordingly, it was not a "rush to judgment," but Jeffrey's own misconduct, omissions and complete disregard for the legal orders imposed by the trial court which resulted in him being found in contempt. Jeffrey's first assignment of error is overruled.

### *Second Assignment of Error*

**{¶50}** In his second assignment of error, Jeffrey maintains that the trial court abused its discretion in sentencing him to serve three days in jail as a civil contempt sanction. Specifically, Jeffrey claims that his jail sentence is a criminal contempt sanction that cannot be imposed for a finding of civil contempt.

**{¶51}** When reviewing a finding of contempt, including a trial court's imposition of penalties, an appellate court applies an abuse of discretion standard. *Fidler v. Fidler,* 10th Dist. No. 08AP-284, 2008-Ohio-4688, ¶ 11, citing *In re Contempt of Morris*, 110 Ohio App.3d 475, 479, 674 N.E.2d 761 (8th Dist.1996). An abuse of discretion implies the trial court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶52}** "The court may punish disobedience of its order pursuant to both R.C. 2705.02(A) and its inherent power to enforce its authority." *Zakany v. Zakany*, 9 Ohio St.3d 192, 459 N.E.2d 870 (1984), syllabus. In particular, R.C. 2705.05 provides, in pertinent part:

> **(A) In all contempt proceedings, the court shall conduct a hearing. At the hearing, the court shall investigate the charge and hear any answer or testimony that the accused makes or offers and shall determine whether the accused is guilty of the contempt charge. If the accused is found guilty, the court may impose any of the following penalties:**
>
> **(1)  For a first offense, a fine of not more than two hundred fifty dollars, a definite term of imprisonment of not more than thirty days in jail, or both;**

**{¶53}** As previously mentioned, civil contempt is meant to be remedial or coercive in nature and is imposed for the benefit of the complainant. *Pugh*, 15 Ohio St.3d 136, 139, 472 N.E.2d 1085. The burden of proof for civil contempt is clear and convincing evidence. *Flowers v. Flowers*, 10th Dist. No. 10AP-1176, 2011-Ohio-5972, ¶ 9. The key distinguishing feature of a civil contempt sanction from a criminal contempt sanction is that the trial court must give the contemnor an opportunity to purge the contempt. *Carroll v. Detty*, 113 Ohio App.3d 708, 712, 681 N.E.2d 1383 (4th Dist.1996). Thus, "[t]he contemnor is said to carry the keys of his prison in his own pocket * * * since he will be freed if he agrees to do

as so ordered." *Brown v. Executive 200, Inc.*, 64 Ohio St.2d 250, 253, 416 N.E.2d 610 (1980).

**{¶54}** In contrast, criminal contempt sanctions are not coercive, but rather punitive in nature. *State v. ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 555, 2001-Ohio-15, 740 N.E.2d 265. Imprisonment for criminal contempt is unconditional and serves as punishment for a completed act of disobedience, vindicating the authority of the court. *Brown* at 254. In order to constitute criminal contempt, a sanction must have an "overriding punitive purpose [.]" *State v. Kilbane*, 61 Ohio St.2d 201, 206, 400 N.E.2d 386 (1980). The burden of proof for criminal contempt is proof beyond a reasonable doubt. *Flowers*, 10th Dist. No. 10AP-1176, 2011-Ohio-5972, ¶ 10 citing *Brown* at 251.

**{¶55}** Constitutional due process requires that an alleged contemnor be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. *Mosler, Inc. v. United Auto., Aerospace & Agr. Implement Workers of Am., Local 1862*, 91 Ohio App.3d 840, 843, 633 N.E.2d 1193 (12th Dist.1993); see, also, *Cincinnati v. Cincinnati Dist. Counsel 51*, 35 Ohio St.2d 197, 203, 299 N.E.2d 686 (1973). In order to comply with due process requirements, notice must set forth the alleged misconduct with particularity. See R.C. 2705.03. Due process of law does not allow a hearing to be held without

giving the defendants " 'timely notice * * * of the specific issues that they must meet.' " (Emphasis sic.) *State ex rel. Johnson v. Perry Cty. Court*, 25 Ohio St.3d 53, 57-58, 495 N.E.2d 16 (1986), quoting *In re Gault*, 387 U.S. 1, 33-34, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

**{¶56}** Here, Justin filed two motions for contempt apprising Jeffrey of the nature of the charges against him so that he may prepare a defense. After a two-day hearing, where he was given sufficient opportunity to present his defenses to the contempt charges, the trial court found Jeffrey in civil contempt, by clear and convincing evidence, for failing to provide a proper accounting as required by its prior order. The trial court gave Jeffrey an opportunity to purge the contempt by fully cooperating and assisting the forensic accountant with the investigation and with compiling the accounting of the UGMA/UTMA accounts and College Fund Trust. And, on the record, the trial court specifically cautioned Jeffrey that it would not hesitate to put him in jail if he again failed to comply with its orders.

> **I will caution you, Mr. Whitman, that the fact that you're an attorney is not going to save you from jail if this doesn't come out to be right. Whether you're an attorney or a dad or not, one of the punishments under contempt is jail.**

(Jan. 9, 2009 Hrg, Tr. at 669).

-28-

**{¶57}** The trial court ordered Jeffrey to assist in the forensic accounting so that a complete and accurate accounting could be created for Justin's review. The trial court further put Jeffrey on notice of a potential jail sentence to coerce him into complying with its order. As previously discussed, the nature of civil contempt is coercive and remedial and imposed for benefit of the complainant. We believe it is clearly established in the record that the trial court warned Jeffrey about the possibility of jail to achieve these ends.

**{¶58}** In reaching this conclusion, we acknowledge that instead of simply warning the contemnor in general terms of a possible jail sentence, some courts have chosen in civil contempt cases to actually impose a jail sentence as a contempt sanction and then suspend the sentence, as a preferred method to both coerce the contemnor's compliance with the court's order and to provide him an opportunity to purge. See, e.g., *Flowers v. Flowers,* 10th Dist. No. No. 10AP–1176, 2011-Ohio-5972; *State ex rel. Cordray v. Tri-State Group, Inc.,* 7th Dist. No. 07-BE-38, 2011-Ohio-2719. However, while it might be the preferred practice for a trial court to formally impose and suspend a specific jail sentence in certain instances, we found no authority mandating that procedure as the *only permissible method* for the opportunity to purge to be framed or for a jail sentence to be imposed as a civil contempt sanction.

**{¶59}** Moreover, in the absence of such authority, we believe that restricting the trial court to imposing a suspended jail sentence as the *only permissible method* for imposing a jail sentence as a civil contempt sanction, is an unnecessary impingement on the statutory grant given to the trial court to punish disobedience of its orders and the inherent power of the trial court to enforce its authority—especially under the circumstances of this case where the trial court explicitly warned the contemnor of a possible jail sentence as a consequence for his failure to purge the contempt.

**{¶60}** In sum, we believe the overall circumstances of this case clearly support the civil contempt finding and the three day jail sentence as a civil contempt sanction. Moreover, Whitman was clearly and specifically apprised in advance by the trial court of the possibility of jail as a sanction if he did not cooperate with the forensic accountant. As a result, we believe the imposition of the jail sentence was consistent with the prior warning of the court; that the warning of jail for failure to cooperate clearly provided both a sufficient due process apprisal and the necessary opportunity to purge; and thus the jail sentence constituted a permissible consequence for his failure to purge in this case.

**{¶61}** Accordingly, we find that the trial court's jail sentence was supported by clear and convincing evidence and was consonant with the objectives of civil

contempt. Therefore, the trial court did not abuse its discretion in sentencing Jeffrey to three days in jail as a civil contempt sanction. Jeffrey's second assignment of error is overruled.

### *Third Assignment of Error*

{¶62} In his third assignment of error, Jeffrey contends that the trial court erred in awarding attorney fees to Justin in the amount of $104,128.57. Jeffrey raises three specific arguments relating to the issue of attorney fees: 1) Justin is not the real party in interest to be awarded the attorney fees; 2) the trial court awarded fees for the incorrect time period of representation and; 3) the trial court's decision runs afoul of the Hancock County Local Rules of Court governing contempt.

{¶63} "A trial court may, within its discretion, include attorney fees as part of the costs taxable to a defendant found guilty of civil contempt." *Planned Parenthood Ass'n of Cincinnati, Inc. v. Project Jericho*, 52 Ohio St.3d 56, 67, 556 N.E.2d 157 (1990) citing *State, ex rel. Fraternal Order of Police, v. Dayton*, 49 Ohio St.2d 219, 361 N.E.2d 428 (1977). In particular, the trial court may award damages to a complainant where it can be proven that the damages were a direct result of the contempt. *RLM Industries, Inc. v. Indep. Holding Co.*, 83 Ohio App.3d 373, 377, 614 N.E.2d 1133 (8th Dist.1992) citing *Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 299 N.E.2d 686 (1973).

**{¶64}** First, Jeffrey argues that Justin is not the "real party in interest" to be awarded attorney fees as a result of the contempt proceedings. Jeffrey argues that because Justin's mother, Jeffrey's ex-wife, signed as a guarantor on the fee agreement established between Justin and his counsel, and acted as Justin's power of attorney, she—not Justin, is the real party in interest. Notably, Jeffrey fails to cite to any authority in support of his argument. Instead, he simply makes bald assertions, which amount to mere conjecture, that Justin's attorneys were acting "at the behest" of Justin's mother in proceeding with this lawsuit.

**{¶65}** The evidence established at the hearing on the issue of attorney fees demonstrates that Justin signed the fee agreement in 2006 for his representation by his attorneys in pursuing the accounting petition and the collection of any custodial money belonging to him. Justin's mother signed as a guarantor on the fee agreement. However, as explained at the hearing by the expert on attorney fees, an attorney who specializes in litigation involving forensic accounting and trust matters, it is not unusual for there to be a guarantor of attorney fees in a matter such as this one. The expert explained that the guarantor is not the client, but the person who actually signs the fee agreement to be personally represented by the attorney is the client. In addition, the expert explained that a power of attorney is utilized in a case for various reasons and does not negate the fact that

Justin is the client according to the fee agreement. Notably, Jeffrey stipulated to the expert being qualified to discuss matters relating to assessing the reasonableness of attorney fees in these particular cases.

**{¶66}** Jeffrey next argues that the trial court erred in determining the time frame of attorney fees in its award to Justin. We note that Jeffrey stipulated to the reasonableness of the rates charged by Justin's attorneys. The trial court awarded Justin the attorney fees he incurred from April 18, 2006 to December 20, 2010. At the hearing on attorney fees, Justin's attorneys presented a detailed timeline documenting their representation of Justin relating to the accounting and contempt proceedings, which spanned four-and-a-half years, as well as all the invoices sent to Justin describing the legal services performed on his behalf. Expert testimony also established that the hours expended by Justin's counsel in this case were reasonable and commensurate with cases as complex as this one.

**{¶67}** Moreover, in its judgment entry awarding Justin attorney fees, the trial court noted that Jeffrey's conduct, in refusing to cooperate and in creating obstacles to Justin receiving an accounting from the inception of this case, was the primary reason Justin accrued these attorney fees. In doing so, the trial court found that this specific award of attorney fees "puts [Justin] in the position he should have been, if not for [Jeffrey's] contemptuous behavior. It also recognizes

the results achieved. The award is directly attributable to [Jeffrey's] behavior. He could have avoided this by providing [Justin] with an accounting at first request." (JE April 7, 2011 at 4).

{¶68} Finally, Jeffrey argues that the trial court's award of attorney fees as a contempt sanction violates Hancock County Local Rule 2.16, which limits *a fine* for a first offense of contempt to $250.00. However, Jeffrey neglects to mention that this local rule is a domestic relations rule. In addition, the award of attorney fees is not synonymous with imposing a fine. Therefore, we fail to see how this rule affects the trial court's discretion in awarding attorney fees as a contempt sanction in a probate matter.

{¶69} Based on the foregoing, we conclude that the trial court did not abuse its discretion in awarding Justin $104,128.57 in attorney fees. The evidence before the trial court established that Justin was at all times considered the client under the fee agreement between him and his attorneys. Moreover, the record supports that the amount of attorney fees awarded was reasonable and incurred by Justin as a direct result of Jeffrey's contemptuous conduct. Jeffrey's third assignment of error is overruled.

Case No. 5-11-20

{¶70} For all these reasons, the judgments are affirmed.

*Judgments Affirmed*

**ROGERS, J. and \*FRENCH, J., concurs.**

**\* Judge Judith L. French sitting by assignment from the Tenth District Court of Appeals**