[Cite as *Cartwright v. Batner*, 2014-Ohio-2995.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

KIMBERLY A. CARTWRIGHT

     Plaintiff-Appellant

v.

DAVID S. BATNER, TRUSTEE, et al.

     Defendant-Appellee

Appellate Case No.    25938

Trial Court Case No.   2011-CV-3520

(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of July, 2014.

. . . . . . . . . . .

JAMES R. KINGSLEY, Atty. Reg. No. 0010720, 157 West Main Street, Circleville, Ohio 43113
     Attorney for Plaintiff-Appellant

TIMOTHY A. TEPE, Atty. Reg. No. 0039324, 255 East Fifth Street, 1900 Chemed Center, Cincinnati, Ohio 45202
     Attorney for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}     In this case, Plaintiff-Appellant, Kimberly Cartwright, appeals from judgments rendering an accounting on a revocable trust, and awarding attorney fees to Defendants-Appellees, David S. Batner, Trustee of the Lorraine M. Batner Revocable and Irrevocable Trusts, and David S. Batner, individually.[1]  In support of her appeal, Kimberly contends that the trial court erred by failing to require David to itemize and account for every expenditure from the trust.   Kimberly further contends that the trial court erred by not beginning the accounting in 2005, when Lorraine Batner's dementia appeared, and assets were allegedly placed into the revocable trust.

{¶ 2}     In addition, Kimberly maintains that the trial court erred in dismissing her claim for treble damages under R.C. 2307.60 and R.C. 2307.61.   Finally, Kimberly contends that the trial court erred in awarding David some attorney fees for defending the accounting action, and in denying her some fees for discovering David's defalcations.

{¶ 3}     We conclude that the trial court did not abuse its discretion in determining that the accounting was adequate for the revocable trust for periods between June 2007 and 2009. Although David admitted to having improperly expended money from the trust, the sum he took is reasonably consistent with the tally made by Kimberly's witness after having received the

---

[1]   For purposes of convenience, Plaintiff-Appellant, Kimberly Cartwright, and Defendant-Appellee, David Batner, will be referred to by their first names.

accounting documents from David.

{¶ 4}    The trial court did err in concluding that the claim regarding David's use of a power of attorney belonged to the estate, and that the remedy was in probate court.  Kimberly was entitled to bring an action in common pleas court, which had concurrent jurisdiction over the matter.  The court also erred in concluding, on the merits of this claim,  that Kimberly failed to prove a misuse of the powers of attorney.  There was sufficient evidence of transfers of funds to David, causing the burden to shift to David to show that his conduct was free of undue influence and fraud.  David failed to present such evidence.  Additionally, David violated prohibitions against self-dealing with respect to a condominium that was part of the irrevocable trust, and should be required to reimburse the trust for the fair market rental value of the condominium from the time that he began living there.

{¶ 5}    We further conclude that the trial court erred in dismissing Kimberly's claim for civil damages under R.C. 2307.60 and R.C. 2307.61.  Because of the error regarding David's alleged misuse of the power of attorney and Kimberly's entitlement to bring a civil action under R.C. 2307.60 and R.C. 2307.61, the attorney fee awards must be reversed.

{¶ 6}    Accordingly, the decision of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings.


I.  Facts and Course of Proceedings


{¶ 7}    This tale of warring siblings began in 2004, when Lorraine Batner, who was then about 81 years old, was concerned about protecting her estate should she need home nursing

care.[2]   At the time, Lorraine had assets of approximately $319,389, and also received a substantial civil service pension and social security benefit every month.   Based on these probate concerns, Lorraine consulted with Michael Millonig, an estate planning specialist.   Before consulting Millonig, Lorraine had established a revocable trust in 1993, and had a prior will that was written in 2003.   Lorraine was the trustee for that trust, and her children, David and Kimberly, were successor co-trustees.   The 2003 will left Lorraine's property equally to David and Kimberly.   Also, in 2003, David became the holder of a power of attorney for Lorraine.

{¶ 8}   David made the initial contact with Millonig and attended some meetings with his mother and the attorney.   Millonig was aware that Lorraine had been diagnosed with dementia and Alzheimer's.   As a result, Millonig had Lorraine evaluated by a doctor to obtain a medical opinion about her competency to sign legal documents.   Upon receiving the doctor's report, Millonig concluded that Lorraine was capable of doing an estate plan.

{¶ 9}   Millonig decided that Lorraine could place about $150,000 in an irrevocable trust, which would protect her estate from Medicaid claims.   Accordingly, he prepared the irrevocable trust documents as well as a deed transferring an unencumbered condominium that Lorraine owned into the trust.   The condominium was valued at about $115,000.   In addition, $35,000 was placed into the irrevocable trust.   The funds for this came from Lorraine's Day Air Credit Union ("Day Air") Account No. 6200 and from Lorraine's Day Air Checking Account No. 687588 ("588").   David was named the sole trustee for the irrevocable trust.

{¶ 10}   Millonig also prepared an amended and restated revocable trust document that replaced the 1993 revocable trust document.   He kept the same name for the trust, which was

---

[2]   To avoid confusion, we will refer to Lorraine Batner by her first name.

called the Lorraine Batner Trust, 5/12/1993. Both Lorraine and David were named as co-trustees, and the plan was that the rest of Lorraine's assets would be placed in the revocable trust. Under the terms of the trusts and the new will, David was entitled to receive the first $87,400 upon Lorraine's death, based on advancements that had been made to Kimberly. After that deduction, the remaining assets in the irrevocable and revocable trusts were to be divided equally between the two siblings.

{¶ 11}  David's position at trial was that the revocable trust had been funded only with ten dollars and Lorraine's household goods and furnishings prior to the time that he took over as trustee in June 2007, when his mother was placed in a nursing home. At that time, signature cards were filled out, transferring ownership of Lorraine's Day Air Checking Account No. 588 to the revocable trust. Kimberly's position was that a "Schedule A" attached to the irrevocable trust, transferred the Checking Account No. 588 and all of Lorraine's other remaining assets when the irrevocable and revocable trusts were created. Kimberly also took the position that David should have to account for these assets between 2005 and June 2007.

{¶ 12}  At the bench trial, the parties disputed the extent to which Lorraine handled her own affairs between 2005 and 2007, and the extent of her competency during that time. According to David, Lorraine was fine throughout 2005, and may have even been driving into 2006. He further indicated that Lorraine handled her affairs and that he was not the only one who had access to her credit card during this time. In contrast, Kimberly stated that Lorraine had dementia in late 2004, and was acting odd and saying unusual things. As an example, Lorraine thought Kimberly was her mother at times. In addition, when President Bush was elected, Lorraine wanted to know how to dress for the inaugural ball. Kimberly stated that she

had not seen her mother write a check since July 2005, and Lorraine did not have access to her own checkbook after she moved in with Kimberly in December 2005 or January 2006. Further, after July 2005, David gave Kimberly Lorraine's credit card only three or four times, to purchase groceries.

{¶ 13} Lorraine died in August 2009. Although David was the executor of the estate, he did not open an estate in probate court. Instead, an attorney for St. Leonard's, where Lorraine had been residing, opened an estate in order to collect on $27,000 allegedly owed to the nursing home. Kimberly also filed an action in probate court in October 2010 regarding David's failure to probate the estate. In addition, she filed another action in probate court in January 2010, requesting an accounting. Between 2005 and 2009, about $337,731.94 had been deposited into Lorraine's Checking Account No. 588. However, by the time of the bench trial in January 2013, the revocable trust had a balance of about $1,000. The assets in the irrevocable trust had remained unchanged since its initiation in 2004, other than accumulated interest paid on the cash that had been included in the trust.

{¶ 14} The probate action was dismissed in May 2011, and Kimberly filed the present action on May 13, 2011, against David, individually and as trustee of Lorraine's irrevocable and revocable trusts. In this action, Kimberly asserted the following claims: (1) for an accounting, pursuant to R.C. 5808.13; (2) breach of fiduciary duty; (3) breach of a common law duty to maintain proper records and accounts; (4) conversion of trust assets to David's own benefit; (5) civil conversion of assets and triple damages under R.C. 2307.61; (6) an injunction; and (7) intentional interference with expectation of inheritance.

{¶ 15} The case was tried to the bench over two days, in late January and early

February 2013. Prior to trial, Kimberly dismissed her claims for intentional interference with expectation of inheritance, and the trial proceeded on the remaining claims. Following the trial, the court issued a decision, concluding: (1) that David had not committed misconduct with respect to the irrevocable trust, and was entitled to $12,000 in fees for administering the trust; (2) that David's acts regarding the revocable trust, at the least, constituted willful misconduct, and he was required to reimburse the trust in the amount of $59,902.57. David was also not entitled to claimed compensation of $6,000 in fees for administering the revocable trust; (3) Bank fees incurred for early withdrawal of CDs were not fraud; (4) the court had insufficient information on attorney fees already paid and presently due, and would need to hold a further hearing; (5) the remedies in R.C. 2307.61 were not available to Kimberly; (6) there was a failure of proof regarding a Northern Communities account; and (7) the court lacked jurisdiction to consider misconduct from the 2005-2007 time frame, as redress for that alleged issue would be in probate court.

{¶ 16} Consistent with the decision, the trial court held a further hearing on attorney fees in July 2013. After that hearing, the trial court concluded that Kimberly was entitled to receive $12,384 in attorney fees rather than the $58,342.58 she had expended. The court reasoned that this smaller part of the fees had been earned from the beginning of her attorney's representation through March 2011, when David provided an accounting matching the one used at trial. Based on the same reasoning, the court held that David was entitled to the fees he incurred from April 2011 through June 2013, with a 40% reduction for his misconduct. Thus, of the $109,635.97 in total fees that David claimed, David would be entitled to fees of $46,390.90. The court also reduced the hourly amount charged by David's attorney, from $430 to $400.

Finally, the court overruled a motion for reconsideration that Kimberly had filed after the original decision on the merits.

{¶ 17}   Kimberly appeals from the decision on the merits, the denial of the motion for attorney fees, and the decision awarding attorney fees.

II.   Did the Trial Court Err Regarding the Accounting?

{¶ 18}   Kimberly's First Assignment of Error, quoted verbatim, states that:

What is Required to Constitute a Proper Trust Accounting and When Must

It Be Presented?   Is an Attorney's Accounting at Trial Too Late?

{¶ 19}   Under this assignment of error, Kimberly contends that the trial court should have required David to more thoroughly detail and itemize the expenditures from the revocable trust.   Kimberly also contends that the accounting was not presented until trial, and, therefore, was untimely.

{¶ 20}   "Accounting issues and the award of damages that may appear to be necessary fall within the sound discretion of the trial court.   As a result, our review is for abuse of discretion."   *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 300, 741 N.E.2d 155 (2d Dist.2000), citing *Sandusky Properties v. Aveni*, 15 Ohio St.3d 273, 274-275, 473 N.E.2d 798 (1984).   "This means we will affirm unless we find the trial court's attitude 'unreasonable, arbitrary or unconscionable.' "   *Id.*, quoting *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "Decisions are unreasonable if they are not supported by a sound reasoning process."   *Id.*

{¶ 21}   Effective January 1, 2007, the legislature amended various sections of the

Revised Code, and enacted new sections for purposes of adopting an Ohio trust code. *See* Sub. H.B. 416, 2006 Ohio Laws File 128. Pursuant to that act, R.C. Chapters 5801 to 5811 may be cited as the Ohio trust code. *See* R.C. 5801.011. Under newly-enacted R.C. 5808.01, "[u]pon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with Chapters 5801. to 5811. of the Revised Code." In addition, the trustee is required to administer the trust "solely in the interests of the beneficiaries." R.C. 5808.02(A). The law as amended and enacted was specifically intended to apply retroactively to trusts created before its effective date. *See* R.C. 5811.03(A)(1). It also applies "to judicial proceedings concerning trusts commenced before the effective date of those chapters unless the court finds that application of a particular provision of those chapters would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties, in which case the particular provision does not apply, and the superseded law applies." R.C. 5811.03(A)(3).

{¶ 22} Even before the new act, however, the law provided that "a trusteeship is primarily and of necessity a position of trust and confidence, and that it offers an opportunity, if not a temptation, to disloyalty and self-aggrandizement. The connotation of the word and name 'trustee' carries the idea of a confidential relationship calling for scrupulous integrity and fair dealing." (Citation omitted.) *In re Binder's Estate*, 137 Ohio St. 26, 38, 27 N.E.2d 939 (1940).

{¶ 23} A beneficiary of a trust is defined, in pertinent part, as "a person that has a present or future beneficial interest in a trust, whether vested or contingent * * * ." R.C. 5801.01(C). Thus, with respect to both the irrevocable and the revocable trusts, David owed

Kimberly a duty to administer the trust in good faith, in accordance with her interest as a beneficiary.

{¶ 24} Regarding record-keeping, R.C. 5808.10(A) and (B) require trustees to keep "adequate records" of a trust's administration and to "keep trust property separate from the trustee's own property." This statute, however, does not define what constitutes an adequate record. Nonetheless, R.C. 5808.13(C) does address annual accounting requirements, and provides, in relevant part, that:

> A trustee of a trust that has a fiscal year ending on or after January 1, 2007, shall send to the current beneficiaries, and to other beneficiaries who request it, at least annually and at the termination of the trust, a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee's compensation, a listing of the trust assets, and, if feasible, the trust assets' respective market values.

{¶ 25} A current beneficiary is defined in R.C. 5801.01(F) as "a beneficiary that, on the date the beneficiary's qualification is determined, is a distributee or permissible distributee of trust income or principal." In the case before us, Kimberly became a current beneficiary of both trusts in August 2009, when Lorraine died. By statute, David was required to provide at least an annual accounting. Kimberly filed an action requesting an accounting in January 2010, but David did not provide an accounting until March 2011 that essentially matched the amounts that Kimberly's witness (her husband) testified to at trial. Kimberly contends that even this account was insufficiently detailed.

{¶ 26} In the case of *In re Marjorie A. Fearn Trust*, 5th Dist. Knox No. 11-CA-16,

2012-Ohio-1029, the trustee's accounting was a handwritten ledger that did not include an inventory or a running account of daily disbursements and receipts. *Id*. at ¶ 25. The court of appeals noted that "non-professional trustees are not necessarily held to the strict accounting standards of professional trustees * * *." *Id.* at ¶ 26. However, the court also held that the ledger and a supplemental accounting fell "far beneath the standard of care mandated by R.C. Chapter 5808." *Id.*

{¶ 27} At least one court has looked to R.C. 2109.303 for "guidance on how to construct an accounting." *Whitman v. Whitman*, 3d Dist. Hancock No. 5-11-20, 2012-Ohio-405, ¶ 42. In this regard, R.C. 2109.303(A) states that:

> Every account shall include an itemized statement of all receipts of the testamentary trustee or other fiduciary during the accounting period and of all disbursements and distributions made by the testamentary trustee or other fiduciary during the accounting period. *The itemized disbursements and distributions shall be verified by vouchers or proof * * *.* In addition, the account shall include an itemized statement of all funds, assets, and investments of the estate or trust known to or in the possession of the testamentary trustee or other fiduciary at the end of the accounting period and shall show any changes in investments since the last previous account. (Emphasis added).

{¶ 28} After reviewing the record, we conclude that David failed to provide an account until at least March 2011, in violation of his duties as a trustee. David also failed to provide itemized disbursements that were verified by receipts or proof. However, David admitted to having improperly expended money from the trust, and that sum ($46,720.68) is reasonably

consistent with the tally made by Kimberly's witness after having received the accounting documents from David. As a result, we cannot say that the trial court abused its discretion in determining that the untimely accounting was adequate.

{¶ 29} Accordingly, Kimberly's First Assignment of Error is overruled.

### III. The Accounting and Other Issues Pertaining to the Trusts

{¶ 30} Kimberly's Second Assignment of Error (incorrectly phrased as a question), states as follows:

What Assets Must Be Included in a Proper Trust Accounting?

### A. Content of the Revocable Trust

{¶ 31} Under this assignment of error, Kimberly presents several issues. Essentially, in these issues, Kimberly contends that the trial court erred in excluding the time period of 2005 through June 7, 2007 from the accounting period for the revocable trust. June 7, 2007 is the date upon which Lorraine's Day Air Checking Account No. 588 was placed in the revocable trust. Prior to that time, David was the POA for Lorraine. Kimberly contends that David should have been required to account for approximately $277,363 of funds in the checking account between 2005 and 2007.

{¶ 32} The trial court concluded that Lorraine, as settlor of the revocable trust, was the individual responsible for transferring assets into the trust, and that David had no obligation to do so. The court further held that Kimberly lacked standing to bring a claim based on the POA against David, because the claim was subject to redress in probate court, not the common pleas

court. Specifically, in the context of the POA, David was acting on behalf of his principal, Lorriane, and any claim for misconduct would belong to her estate.

{¶ 33} At trial, a witness from Day Air testified that Lorriane's checking account No. 588, was transferred into the revocable trust on June 7, 2007, when a signature card was signed transferring the account into the trust. Prior to that time, Lorraine was the owner on the account. The attorney who prepared the trusts also testified that regardless of what is listed on the schedule for assets for a trust, the settlor has to take action to transfer the asset into the trust. For example, if a bank certificate of deposit (CD) is listed as a trust asset, the settlor must go to the bank and place the CD in the trust.

{¶ 34} In contrast, Kimberly argues, citing R.C. 5804.01 and other authority, that where a settlor and trustee are the same person, a trust is created by a declaration by the owner that he or she holds the property as trustee for another, and the settlor need take no further action to fund the trust.

{¶ 35} R.C. 5804.01 provides several ways of creating a trust, including:

(A) Transfer of property to another person as trustee during the settlor's lifetime or by will or other disposition taking effect upon the settlor's death;

(B) Declaration by the owner of property that the owner holds identifiable property as trustee;

(C) Exercise of a power of appointment in favor of a trustee;

(D) A court order.

{¶ 36} However, the fact that a trust instrument has been signed does not mean that all the property in the trust has been delivered. In fact, this point is made in the Official Comments

to the Uniform Trust Law accompanying Uniform Trust Code 401, which is analogous to R.C. 5804.01. These comments state that "Furthermore, the property interest need not be transferred contemporaneously with the signing of the trust instrument. A trust instrument signed during the settlor's lifetime is not rendered invalid simply because the trust was not created until property was transferred to the trustee at a much later date, including by contract after the settlor's death." Uniform Trust Code 401 Comment (2006).

{¶ 37} Accordingly, as the settlor of the revocable trust, Lorraine had the ability to sign the revocable trust instrument and later fund and create the trust by conveying property to it. She could also fund and create the revocable trust contemporaneously (which she did by conveying household goods and $10.00), and add more property later. *See* Plaintiff's Ex. 6 and 7. In this regard, the comments to the Uniform Trust Law indicate that "[t]he property interest necessary to fund and create a trust need not be substantial." *Id.* at Uniform Trust Code 401 Comment.

{¶ 38} Kimberly is correct in maintaining that Lorraine could place property in a trust by declaring that she held the property as trustee. *See* R.C. 5804.01(B). However, the relevant points for purposes of David's liability to account for the revocable trust proceeds between 2005 and 2007 are when Checking Account No. 588 was transferred into the trust, and when David assumed responsibility for the trust. The checking account was transferred into the trust on June 7, 2007, when the signature card for Day Air Checking Account No. 588 was changed to designate the revocable trust as the account holder. Prior to that time, the checking account was not part of the trust, and Lorraine retained authority over the checking account as the owner. Admittedly, David had a POA and could write checks on Lorraine's behalf. David,

therefore, could have abused his authority as a POA with respect to the checking account, but that issue differs (as the trial court recognized) from the issue of whether David was required to provide an accounting for the revocable trust between 2005 and June 2007.

**{¶ 39}** Kimberly also argues that Day Air Checking Account should have been part of a trust because it was originally listed as an asset on a schedule to the irrevocable trust. *See* Plaintiff's Trial Ex. 9. However, at trial, David testified that while Lorraine's attorney originally intended the assets in schedule A to be part of the irrevocable trust, Lorraine thought about it and decided she did not want to put these accounts into the trust. She wanted to simplify the trust by putting her condominium and some cash into the account. Accordingly, the trust was changed and resigned in February 2005. Lorraine's attorney, Mr. Millonig, indicated that he did not recognize Ex. 9, and that Ex. 10 (which lists the condominium and $35,000 in cash) looked correct as to what they finally decided to give to the irrevocable trust.

**{¶ 40}** In addition, Millonig stated that signing a document like Ex. 9 and attaching it to a trust does not mean that the trust owns the assets; instead, the settlor has to sign documents to transfer the assets, such as signing cards at the bank. While this would be the preferred approach, it appears not to be strictly necessary in situations involving revocable trusts. *See* *Stephenson v. Stephenson,* 163 Ohio App.3d 109, 2005-Ohio-4358, 836 N.E.2d 628, ¶ 6-18 (9th Dist.)

**{¶ 41}** In *Stephenson*, the court of appeals concluded that an IRA and some brokerage accounts were part of a revocable trust even though the settlor had never transferred ownership to the trust, and even though these accounts listed beneficiaries other than the trust. *Id.* at ¶ 3, 4, and 6. The court distinguished between irrevocable trusts and revocable trusts, and concluded

that the requirement of clear proof that an asset has been properly delivered to the trust (as is the case with inter vivos gifts), is not required in situations involving revocable trusts, where the settlor is the trustee. *Id.* at ¶ 8-12. The court relied on a prior case, which had held that "mere declaration of [the settlor's] intent to place the assets in the trust was sufficient and effective." *Id.* at ¶ 9, citing *Hatch v. Lallo*, 9th Dist. Summit No. 20642, 2002-Ohio-1376, ¶ 11. In this regard, the court of appeals noted that:

> The *Hatch* court explained its rationale:
>
> "The important question in this case is whether the decedent divested himself of the equitable interest in the property in question. If he made such a transfer of the equitable interest, the separation of equitable and legal interests that is required to support a trust is present and the decedent, as settlor-trustee, held legal title to the trust property subject to the trust."
>
> * * * Based on this premise, the *Hatch* court identified four aspects that instructed its decision: the decedent unambiguously evidenced an intent to create the trust at the time it was executed, the decedent divested himself of an equitable interest in the asset, the decedent separated the asset from the balance of his personal property, and the beneficiary had access to the asset once it was in the trust. (Citation omitted.) *Stephenson* at ¶ 9, quoting *Hatch* at ¶ 18-19.

{¶ 42} After applying these factors to the case before it, the court of appeals concluded that the settlor had fulfilled the conditions for divestment, and that the property had been transferred to the trust. *Stephenson,* 163 Ohio App.3d 109, 2005 -Ohio-4358, 836 N.E.2d 628, at ¶ 17.

**{¶ 43}** These concepts do not, however, support a finding that Day Air Checking Account No. 588 was transferred to a trust prior to June 7, 2007. Significantly, the only mention of transferring that asset to a trust was in connection with the irrevocable trust. However, as David and the trust attorney testified, Lorraine rejected the transfer and elected to place only the condominium and $35,000 in cash in the irrevocable trust. Day Air Checking Account No. 588 was not listed as an asset in any schedule to the revocable trust, and there is no basis for concluding that it should have been part of the revocable trust. In this regard, we note that the Revocable Living Trust Agreement states, with respect to the "Trust Estate," that:

> The Settlor has transferred and delivered to the Trustee the property described in Schedule A, which is attached hereto and made a part hereof, the receipt of which is hereby acknowledged by the Trustee. Such property and any other property transferred to and received by the Trustee to be held pursuant to this Trust shall constitute the "Trust Estate" and shall be held, administered and distributed by the Trustee as hereinafter provided. Defendant's Ex. D., p. 1, Item 1.

**{¶ 44}** Schedule A for that trust lists only $10. Ex. D., p. 16. Lorraine also executed a "Transfer of Property in Trust" in December 2004, but it was limited to "household goods, furniture, jewelry, personal effects, currency & coins and all other tangible property located at my [Lorriane's] residence." Plaintiff's Ex. 7, p. 1. This was not effective to transfer Day Air Checking Account No. 588, because the checking account was not a tangible property located at Lorraine's residence.

B. The POA

{¶ 45}   Under this assignment of error, Kimberly also contends that the trial court erred when it found that she lacked standing to bring a claim for misuse of the POA.   Kimberly argues that under R.C. 2101.24(B)(1)(b), probate and common pleas courts have concurrent jurisdiction over powers of attorney.   With certain limitations not applicable to this case, R.C. 2101.24(B)(1)(b) does provide both courts with concurrent jurisdiction over actions involving powers of attorney.   However, the basis of the trial court's decision is that the claim belonged to Lorraine's estate and should be heard in probate court.

{¶ 46}   "Subject-matter jurisdiction refers to the statutory or constitutional authority to adjudicate a case.   Lack of standing, on the other hand, challenges a party's capacity to bring an action, not the subject-matter jurisdiction of the tribunal."   (Citations omitted.)   *Groveport Madison Local Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 137 Ohio St.3d 266, 2013-Ohio-4627, 998 N.E.2d 1132, ¶ 25.   "Standing exists only when (1) the complaining party has suffered or has been threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, (2) the [act] in question caused the injury, and (3) the relief requested will redress the injury."   (Citation omitted.)   *Beaver Excavating Co. v. Testa*, 134 Ohio St.3d 565, 2012-Ohio-5776, 983 N.E.2d 1317, ¶ 8.

{¶ 47}   We conclude that Kimberly did have standing to assert claims against David in common pleas court with respect to his actions as a POA.   As an initial point, R.C. 1337.36(A) provides, in pertinent part, that:

> Any of the following persons may petition a court to construe a power of attorney *or review the agent's conduct and grant appropriate relief*:

* * *

(4) The principal's spouse, parent, or descendant;

(5) An individual who would qualify as a presumptive heir of the principal;

(6) A person named as a beneficiary to receive any property, benefit, or contractual right on the principal's death or as a beneficiary of a trust created by or for the principal that has a financial interest in the principal's estate * * * ."

{¶ 48} In view of these provisions, Kimberly would be permitted to bring an action as a descendent, a presumptive heir, or a person named as a beneficiary upon Lorraine's death. R.C. 1337.41 further states that "[t]he remedies provided under sections 1337.21 to 1337.64 of the Revised Code are not exclusive and do not abrogate any right or remedy under any other provision of law of this state."

{¶ 49} In addition, R.C. 1337.37 provides that:

An agent that violates sections 1337.21 to 1337.64 of the Revised Code is liable to the principal or the principal's successors in interest for the amount required to restore the value of the principal's property to what it would have been had the violation not occurred and the amount required to reimburse the principal or the principal's successors in interest for the attorney's fees and costs paid on the agent's behalf.

{¶ 50} The above statutes became effective in March 2012, as part of the adoption of the Uniform Power of Attorney Act. *See* R.C. 1337.21 and Sub. S.B. 117, 2011 Ohio Laws File 65. However, R.C. 1337.64, also adopted as part of that act, provides that:

(A) Except as otherwise provided in sections 1337.21 to 1337.64 of the Revised Code, on the effective date of this section, those sections apply to all of the following:

(1) A power of attorney created before, on, or after the effective date of this section;

(2) A judicial proceeding concerning a power of attorney commenced on or after the effective date of this section;

(3) A judicial proceeding concerning a power of attorney commenced before the effective date of this section, unless the court finds that application of a provision of sections 1337.21 to 1337.64 of the Revised Code would substantially interfere with the effective conduct of the judicial proceeding or prejudice the rights of a party, in which case that provision does not apply and the superseded law applies.

**{¶ 51}** Standing is evaluated as of the commencement of suit, which in this case was in May 2011. *Groveport Madison Local Schools Bd. of Edn.,* 137 Ohio St.3d 266, 2013-Ohio-4627, 998 N.E.2d 1132, at ¶ 26. However, in view of the provision in R.C. 1337.64(A)(3), we conclude that application of R.C. 1337.36(A) would not substantially interfere with the effective conduct of the judicial proceeding, nor would it prejudice the rights of a party. We say this for two reasons: (1) Kimberly would have been able to bring an action for misuse of the power of attorney prior to the effective date of R.C. 1337.36; and (2) Kimberly would be able to file an action in probate court under R.C. 2109.50 to obtain redress against David's misuse of assets.

{¶ 52} As was noted, R.C. 2101.24 deals with the jurisdiction of probate courts. R.C. 2101.24(A)(1) provides the probate court with exclusive jurisdiction over certain matters, unless otherwise provided by law. However, actions based on powers of attorney are mentioned in the subsection of the statute that gives concurrent jurisdiction to probate and common pleas courts. In this regard, R.C. 2101.24(B)(1) states that:

> The probate court has concurrent jurisdiction with, and the same powers at law and in equity as, the general division of the court of common pleas to issue writs and orders, and to hear and determine actions as follows:
>
> * * *
>
> (b) Any action that involves an inter vivos trust; a trust created pursuant to section 5815.28 of the Revised Code; a charitable trust or foundation; subject to divisions (A)(1)(u) and (z) of this section, a power of attorney, including, but not limited to, a durable power of attorney; the medical treatment of a competent adult; or a writ of habeas corpus * * *.[3]

{¶ 53} The language regarding powers of attorney was added to R.C. 2101.24(B), the concurrent jurisdiction subsection, in 1989. *See* Sub. S.B. 46, 1989 Ohio Laws File 44. The fact that jurisdiction was added for probate courts indicates that jurisdiction was already thought to exist in common pleas courts. Notably, the amendment did not give probate courts exclusive jurisdiction over such actions; only concurrent jurisdiction was provided. *Compare In re Guardianship of Lombardo,* 86 Ohio St.3d 600, 604, 716 N.E.2d 189 (1999) (noting in the context of inter vivos trusts, that "[t]he language of R.C. 2101.24 unambiguously provides the

---

[3] R.C. 2101.24(A)(1)(u) and (z) pertain to medical issues and do not apply to the case before us.

probate court with concurrent jurisdiction with the court of common pleas to address inter vivos trusts.")

{¶ 54}    The fact that jurisdiction existed over actions based on powers of attorney prior to the adoption of the Uniform Powers of Attorney act would not necessarily mean that Kimberly has standing under the pre-existing law.   The issue is whether Kimberly suffered an injury, due to David's alleged acts, that could be redressed.

{¶ 55}    According to Lorraine Batner's will, any property that she owned at the time of her death would be added to the corpus of her trust and distributed in accordance with the terms of the trust agreement.   Plaintiff's Ex. 4.   The intention of the trust agreements and the will was that the estate would have no assets and the probate court would have nothing to administer. Thus, any assets that might be recovered due to David's misuse of the power of attorney would be returned to the trust, not to Lorraine's estate.   In addition, on Lorraine's death, Kimberly's rights as a beneficiary under the trust vested, giving her a legal interest in the corpus of the trust.

{¶ 56}    Typically, beneficiaries of trusts have only equitable interests in a trust until their interest is vested.   "In order for a trust to be a trust, the legal title of the res must immediately pass to the trustee, and the beneficial or equitable interest to the beneficiaries." *First Nat. Bank of Cincinnati v. Tenney*, 165 Ohio St. 513, 518, 138 N.E.2d 15 (1956).   Thus, in the case before us, legal title to the revocable trust passed immediately to David, as trustee, and Kimberly possessed only an equitable interest during Lorraine's lifetime.   However, the Supreme Court of Ohio has also stated that "It is the settled rule of this court to construe all devises and bequests as vesting in the devisee or legatee at the death of the testator, unless the intention of the testator to postpone the vesting to some future time is clearly indicated in the

will." *Bolton's Trustees v. Ohio Nat. Bank*, 50 Ohio St. 290, 293, 33 N.E. 1115 (1893).

{¶ 57} In situations where a trust beneficiary's interest does not vest until the settlor's death, because it is subject to defeasance prior to death (as here), courts have held that the beneficiary cannot maintain a cause of action based on events that occurred prior to the settlor's death. See *Peleg v. Spitz*, 8th Dist. Cuyahoga No. 89048, 2007-Ohio-6304, *aff'd*, 118 Ohio St.3d 446, 2008-Ohio-3176, 889 N.E.2d 1019. In *Peleg*, the beneficiary of a trust filed an action for legal malpractice, breach of fiduciary duty, and negligence against attorneys who had represented her mother with respect to estate planning matters. *Id.* at ¶ 3. The trust was an irrevocable trust, but the settlor reserved the right to change beneficiaries. *Id.* at ¶ 4. After the settlor's death, two relatives who had been disinherited sued, and the beneficiary settled the claims. *Id.* at ¶ 7. The beneficiary then sued the attorneys, contending that their malpractice in executing the irrevocable trust provided the disinherited relatives with a strong case against her in probate court. *Id.* The beneficiary claimed standing because she had a vested interest in the irrevocable trust. *Id.* at ¶ 10.

{¶ 58} However, the court of appeals disagreed, because the beneficiary's interest was subject to defeasance before the settlor's death, and was, thus, subject to complete divestment at the time of the attorney's malpractice. The beneficiary, therefore, lacked the necessary privity with the client to sue the attorneys for malpractice. *Id.* at ¶ 10-23. Based on what it considered persuasive public policy arguments, the court of appeals invited the Supreme Court of Ohio to revisit the issue of whether intended beneficiaries of wills or trusts should have a remedy against attorneys who negligently prepare these types of documents. *Id.* at ¶ 24.

{¶ 59} Subsequently, the Supreme Court of Ohio affirmed the court of appeals based

on the authority of *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167. *See Peleg v. Spitz,* 118 Ohio St.3d 446, 2008-Ohio-3176, 889 N.E.2d 1019, ¶ 2. In *Shoemaker*, the Supreme Court of Ohio decided to adhere to a strict privity rule in order to provide certainty in estate planning and preserve attorney loyalty to clients. *Shoemaker* at ¶ 14-19. The court did note that as a remedy, "a testator's estate or a personal representative of the estate might stand in the shoes of the testator in an action for legal malpractice in order to meet the strict privity requirement." (Citations omitted) *Id.* at ¶ 17.

{¶ 60} However, the case before us does not involve the issue of attorney loyalty, and *Shoemaker* is distinguishable on that ground. More importantly, the Supreme Court of Ohio noted that "[t]he necessity for privity may be overridden if special circumstances such as 'fraud, bad faith, collusion or other malicious conduct' are present." *Id.* at ¶ 11, quoting *Simon v. Zipperstein*, 32 Ohio St.3d 74, 76, 512 N.E.2d 636 (1987). The Supreme Court of Ohio stressed in *Shoemaker* that the plaintiffs failed to plead these matters, and this ground for suing the attorneys was, therefore, not available to them. *Id.*

{¶ 61} While the case before us does not involve legal malpractice, it does involve allegations of fraud, bad faith, and other malicious conduct, i.e., allegations of theft in connection with the POA. As a result, we conclude that Kimberly had standing to file an action based on the misuse of the power of attorney, because her interest in the trust, which vested at Lorraine's death, would have been injured by David's actions, and the remedy would be that the alleged funds would be returned to the corpus of the trust.

{¶ 62} In addition, R.C. 2109.50 permits complaints by "any person interested in the estate * * * against any person suspected of having concealed, embezzled, or conveyed away or

of being or having been in the possession of any moneys, personal property, or choses in action

of the estate * * *." As a beneficiary, Kimberly would have been interested in the estate, and

could have initiated a claim in probate court pursuant to R.C. 2109.50. *See, e.g., Hilleary v.*

*Scherer*, 2d Dist. Miami No. 87-CA-23, 1987 WL 19204, *2 (Oct. 30, 1987) (noting that a

beneficiary may invoke R.C. 2109.50 in probate court to determine whether assets have been

concealed or embezzled, and may also institute an action to compel an administrator to seek out

assets belonging to the estate).

{¶ 63}   In *Goldberg v. Maloney,* 111 Ohio St.3d 211, 2006-Ohio-5485, 855 N.E.2d 856,

the Supreme Court recognized its prior holding that "concealment actions under R.C. 2109.50

and 2109.52 could be applicable to recover certain assets wrongfully concealed, embezzled, or

conveyed away *before* the creation of the estate."   (Emphasis sic.)   *Id.* at ¶ 33, citing *Fecteau v.*

*Cleveland Trust Co.*, 171 Ohio St. 121, 167 N.E.2d 890 (1960).   In *Goldberg*, the court also

distinguished a prior case which had concluded that "a concealment action 'may not be

successfully pursued where it appears from the evidence that title to such property had been

transferred by the ward, *pursuant to a valid agreement*, prior to the guardianship.' " (Emphasis

sic.)   *Id*. at  ¶ 38, quoting *In re Estate of Black,* 145 Ohio St. 405, 62 N.E.2d 90 (1945),

paragraph four of the syllabus.   The court observed that in contrast to *Black*, no valid agreement

in *Goldberg* transferred the principal's assets.

{¶ 64}   Accordingly, Kimberly had at least two potential avenues – an action for misuse

of the power of attorney and conversion, properly brought in common pleas court, or a complaint

for embezzlement under R.C. 2109.50.   Because Kimberly could have brought claims either in

common pleas court or probate court, neither the judicial proceedings nor David would be

prejudiced by the application of the new statute, R.C. 1337.36, to a previously filed action. The trial court in the common pleas court is familiar with the facts and issues, having already tried the case.

{¶ 65} Based on the preceding discussion, the trial court erred in concluding that the claim regarding David's use of the power of attorney belonged to the estate, and that the remedy was in probate court. Kimberly was entitled to bring an action in common pleas court, which had concurrent jurisdiction over the matter. The trial court's error was not necessarily fatal, however, because the court went on to consider the merits of the POA claim. In this regard, the trial court held that the record did not prove that David had breached the POA fiduciary duty owed to Lorraine.

{¶ 66} Kimberly contends that she did prove the amount in the Day Air Checking account from 2005 to June 2007 (about $277,363.99), by producing the account records for that period of time. See Plaintiffs' Exhibits 17, 18, and 19. Kimberly contends that she was not required to search through those records as she did for the records after that point, because her mother was living with her during that time and no expenses should have been incurred. According to Kimberly, this fact alone shifted the burden to David to justify the expenditure of that amount of money.

{¶ 67} "A power of attorney * * * is a written instrument authorizing an agent to perform specific acts on behalf of the principal." *In re Guardianship of Simmons*, 6th Dist. Wood No. WD-02-039, 2003-Ohio-5416, ¶ 25, citing R.C. 1337.09 and *Testa v. Roberts*, 44 Ohio App.3d 161, 164, 542 N.E.2d 654 (6th Dist.1988). (Other citation omitted.) "The holder of a power of attorney has a fiduciary relationship with the principal. Such a relationship is 'one

in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.' " (Citations omitted.) *Simmons at ¶ 25*, quoting *Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (1981). "In such a relationship, the person who holds the power of attorney bears the burden of proof on the issue of the fairness of transactions between himself and the principal." *Id.*, citing *Testa* at 164.

**{¶ 68}** In *Simmons*, the court of appeals also stated that:

Where there is a confidential or fiduciary relationship between a donor and donee, a transfer of money or property from donor to donee is viewed with suspicion that the donor [sic] may have exercised undue influence on the donor. Even if a POA gives an express grant of authority to an attorney-in-fact to make gifts to third persons, including the attorney-in-fact, it does not remove all obligations owed to the principal. In such cases, a presumption of undue influence arises and the burden of going forward with evidence shifts to the donee to show that his conduct was free of undue influence or fraud and that the donor acted voluntarily and with a full understanding of his act and its consequences. The donee may rebut the presumption of undue influence by a preponderance of the evidence. (Citations omitted.) *Id.* at ¶ 26.

**{¶ 69}** The only finding of fact the trial court made regarding the amounts expended between 2005 and June 2007 is that, unlike the period from June 2007 forward, there was no detailed accounting during this time period. Decision, Entry and Order, Doc. #86, p. 6.

**{¶ 70}** Although the accounting is not as detailed, there is sufficient evidence of

transfers to David that shift the burden to David to show that his conduct was free of undue influence and fraud. As a preliminary matter, David admitted to having improperly transferred funds from Lorraine's accounts for his benefit between 2007 and 2009. While this does not necessarily mean that he misappropriated funds before, it would certainly lead one to question the transactions that had occurred previously.

{¶ 71} Lorraine Batner would have been 81 in 2004, when the trusts were created, and she would have turned 82 the following summer, in 2005. At the time the trusts were created, she had amassed a fairly substantial amount of assets (about $319,389), including CDs, an IRA, and a condominium that was unencumbered by debt. Kimberly testified that she never saw her mother write a check after July 2005, and that when Lorraine lived with her (from around January 2006, until she entered a nursing home in June 2007), Lorraine did not have her checkbook. Kimberly also testified that during this time, her mother never went out shopping, could not drive, and did not know what was going on.

{¶ 72} David admitted that he helped his mother with her bills, using the POA. He stated that he did not recall when he began having her bank account statements sent to his house, but thought that it was when she went into the nursing home in 2007, because she was no longer home to receive her mail. To the contrary, however, Defendant's Ex. Z, which includes the Day Air Checking Account No. 588 statements between January 1, 2005 and June 2007, indicates that the statements were being sent to David, not Lorraine, from at least January 1, 2005 until her death. Thus, David would have been in control of the financial information, unless Lorraine, an 82-year old woman with dementia, who did not drive, went to the bank and inquired about the status of her accounts. In addition, the statements for Lorraine's Day Air Visa card were also

being mailed to David's address at least from January 2005 until the date of Lorraine's death. Unless David showed Lorraine the statements (and there is no indication that he did this), only David would have known what amounts were being expended on the VISA card.

{¶ 73} Furthermore, a review of the bank statements for Day Air Checking Account No. 588 reveals questionable activity that does not square with Lorraine's circumstances. In January 2005, Lorraine was receiving a comfortable monthly income of about $4,160, which consisted of a civil service pension and a social security payment. At the end of that month, she had $12,007 in a savings account, after a transfer of approximately $3,062 to the irrevocable trust. She also had $24,868 in a 12-month IRA linked to Account No. 588, and an ending balance in her checking account of $396.48. Among the items listed as a debit is a $735.89 electronic check payment to CUNA Mutual Group. At trial, David claimed not to recognize this check to CUNA. When confronted with a document showing a piece of property mortgaged to CUNA, David admitted purchasing the property, but still claimed not to know what CUNA was. The bank statements show additional payments of $735.89 to CUNA on March 3, 2005, and March 30 2005; and $764.51 payments in both June and July 2005. David never presented any evidence indicating that these payments were made on Lorraine's behalf, rather than his.

{¶ 74} The February 1, 2005 statement for Account 588 shows a $3,000 withdrawal from Lorraine's saving's account. The money was deposited in the checking account and a check was written on the same day for $2,500. In March 2005, the checking account shows, in addition to the two payments to CUNA, a $281.30 payment to Sam's Club and a $444.05 payment to Cingular. It would be possible, but not likely, that an 81-year old woman with dementia would incur these types of expenses.

**{¶ 75}**    Similarly, in May 2005, $4,570 was withdrawn from savings and large checks totaling $2,982, $1,053, and $1,200 were written. The recipients of the checks is not indicated, but the activity is unusual, compared to other months that show more modest expenditures.[4] *Compare* the August 2005 statement, which shows only $720.18 in withdrawals from Checking Account No. 588 – although $800 was withdrawn from the savings account that month and not deposited in checking.   The point is that if the large amounts were regular expenses of Lorraine, they would have been reflected each month.   The inconsistency in the pattern of expenditures again raises an inference that the amounts being expended were not on Lorraine's behalf.

**{¶ 76}**    The June 2005 statement shows checks written to Sam's Club, for $575,  to Sears for $300, and another payment of $764.51 to CUNA.   July 2005, likewise, shows  large expenditures. $6,000 was withdrawn from savings and deposited in checking.   Electronic checks were sent to Sears ($575) and CUNA ($764.51).   Other substantial checks of $2,098, $2,217, and $3,195 were also written.

**{¶ 77}**    The remainder of the statements show the same disturbing trends.   For example, by January 2006, the savings account balance had been depleted so that the account contained only $2,420.72. $21,628.08 was then deposited from some other source, and a check for $4,000 was written on January 10, 2006.   In February 2006, $12,000 was transferred to checking, and six significant checks for amounts ranging from $1,000 to $3,586 were written. (Other checks were written as well.)   In April 2006, $7,000 was transferred from savings to checking, and Lorraine received $4,216.79 in deposits from social security and her pension.   The

---

[4]The reason some expenditures are identified is because they are listed on the statement in the form of electronic checks, while the payees of checks that were apparently written are not identified in the statements.

balance in the checking account at the beginning of May was only $734, meaning that more than $10,000 had been spent. However, the part of the statement that would list the check numbers and amounts is missing.[5] By the end of May 2006, the balance in the savings account was down to less than $2,000, with a $4,000 check having been written on May 16, 2006.

{¶ 78} The VISA statements show similar trends, with purchases that would not conceivably have been made on Lorraine's behalf. As one example (and there are many), the VISA statement for the month ending June 27, 2005, shows that $1,615.97 in expenditures were made that month, including such items as two payments totaling about $372 to Henn Marine in Fairfield, Ohio, and a payment of $410.85 to AAA Waste Water Service in Franklin, Ohio. Plaintiff's Ex. 53. Unlike Lorraine, David owned a boat. Lorraine's condominium was also not located in Franklin, Ohio.

{¶ 79} We have reviewed all the statements and will not discuss them further, other than to note, as indicated, that the pattern of expenditures would be unusual for a person in Lorraine's situation.

{¶ 80} Accordingly, the trial court erred with regard to its conclusion about David's alleged breach of duty regarding the POA account. A presumption of undue influence arose, and David failed to rebut the presumption with evidence showing that his conduct was not fraudulent. Instead of explaining the amounts that were expended, and offering proof that they were legitimate expenses on Lorraine's behalf, or at her behest, David professed ignorance even of payments made for his own mortgage.

---

[5] David did submit a check in his exhibits, indicating that he paid St. Leonard's $608 for his mother's care on April 10, 2006. He failed to provide evidence regarding the remaining $9,000 plus expended that month. Surely, if David had access to one check during that time, he should have had access to the remaining checks.

### C. The Condominium in the Irrevocable Trust

**{¶ 81}** Kimberly's final argument under this assignment of error is that the trial court erred in failing to include the fair rental value of the condominium in the accounting. Kimberly notes that David occupied Lorraine's condominium since June 2012, and argues that he should have been charged with the fair rental value, which was stipulated to be $1,000 per month. Rather than responding to this argument, David contends that the trial court correctly refused to hold him liable for a failure to rent or sell the condominium before or after Lorraine's death. The trial court found that since David was entitled under the terms of the irrevocable trust to hold all property received, that his failure to rent the condominium before January 2010, when the restraining order came into effect, did not amount to fraud, willful misconduct, or gross negligence. Regarding the time period after January 2010, the court concluded that David was precluded from leasing or selling the condominium due to the existence of restraining orders.

**{¶ 82}** When discussing these matters, the trial court stated that Kimberly's only assertion regarding the irrevocable trust was that David had breached his fiduciary duty by failing to lease or sell the condominium. However, this was incorrect, as Kimberly also contended in her trial brief that David had breached his fiduciary duty by living in the condominium rent-free. *See* Plaintiff's Trial Brief, Doc. #83, pp. 6, 9, and 23-24.

**{¶ 83}** As is noted in Kimberly's trial brief, the revocable trust gave the trustee authority to occupy the real property that was part of the trust, upon terms the trustee deemed proper. Defendant's Ex. D, Item VIII(s). However, the condominium was not part of the estate of the revocable trust, and the irrevocable trust, which governed the condominium, did not give

the trustee such authority. Defendant's Ex. B, Item VII(a)-(r). We agree with the trial court that David did not breach his fiduciary duty by failing to rent or sell the condominium after January 2010, due to the existence of the restraining order. David's reasons for failing to rent or sell the condominium between June 2007, when his mother entered a nursing home, and January 2010 are less convincing, but we cannot conclude that the trial court abused its discretion in making this finding. David's expressed reasons were that he wanted to wait and make certain his mother could not return home, and also wanted a place for relatives to stay when they visited his mother.

**{¶ 84}** On the other hand, since David elected to occupy the condominium himself after June 2012, the issue remains whether he should have paid the fair market rental value for the use of the condominium. David has not addressed this matter in his brief.

**{¶ 85}** "Implicit within the duties and powers of a trustee is the prohibition against self-dealing." *In re Marjorie A. Fearn Trust*, 5th Dist. Knox No. 11-CA-16, 2012-Ohio-1029, at ¶ 21, citing R.C. 5808.14(B)(2). In a related context, R.C. 2109.44(A) states that "Fiduciaries shall not buy from or sell to themselves and shall not have in their individual capacities any dealings with the estate, except as expressly authorized by the instrument creating the trust and then only with the approval of the probate court in each instance."

**{¶ 86}** Although David was precluded from leasing or selling the condominium after Lorraine's death, he chose to live in the condominium himself without paying rent to the trust, and also prevented Kimberly from having any access to the condominium. As a result, David violated prohibitions against self-dealing, and should be required to reimburse the trust for the fair market value of the condominium from the time that he began living there.

**{¶ 87}**     Based on the preceding discussion, the Second Assignment of Error is sustained in part, and this matter will be remanded to the trial court for further proceedings with respect to the breach of fiduciary duty regarding the POA and the requirement that David reimburse the trust for the fair market value of rental of the condominium beginning in June 2012.

## IV.   Civil Damage Claim

**{¶ 88}**     Kimberly's Third Assignment of Error states as follows:

> Did the Trial Court Commit Prejudicial Error When It Dismissed Plaintiff's R.C. § 2307.60 Civil Treble Damage Claim?

**{¶ 89}**     Under this assignment of error, Kimberly contends that the trial court erred in dismissing her claim under R.C. 2307.60.   The trial court made two conclusions in this regard. First, the court held that, assuming that Kimberly had been injured by any criminal acts of David, the remedy she sought under R.C. 2307.60 duplicated the recovery she otherwise sought. Second, the court held that R.C. 2307.61 expands upon the recovery available to property owners who file a claim under R.C. 2307.61.   However, the court also held that, as a beneficiary under a trust, Kimberly would not be a property owner.

**{¶ 90}**     Kimberly argues, however, that she is a "property owner" for purposes of the statute because estate assets vest immediately upon death in the devisees and legatees of a will. In contrast, David contends that legal title to the trust property is vested in the trustee.

**{¶ 91}**     R.C. 2307.60(A)(1) provides that:

> Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may

recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

**{¶ 92}** R.C. 2307.61(A) further states that:

If a property owner brings a civil action pursuant to division (A) of section 2307.60 of the Revised Code to recover damages from any person who willfully damages the owner's property or who commits a theft offense, as defined in section 2913.01 of the Revised Code, involving the owner's property, the property owner may recover as follows:

(1) In the civil action, the property owner may elect to recover moneys as described in division (A)(1)(a) or (b) of this section:

(a) Compensatory damages that may include, but are not limited to, the value of the property and liquidated damages in whichever of the following amounts applies:

(i) Fifty dollars, if the value of the property was fifty dollars or less at the time it was willfully damaged or was the subject of a theft offense;

(ii) One hundred dollars, if the value of the property was more than fifty dollars, but not more than one hundred dollars, at the time it was willfully damaged or was the subject of a theft offense;

(iii) One hundred fifty dollars, if the value of the property was more than

one hundred dollars at the time it was willfully damaged or was the subject of a theft offense.

(b) Liquidated damages in whichever of the following amounts is greater:

(i) Two hundred dollars;

(ii) Three times the value of the property at the time it was willfully damaged or was the subject of a theft offense, irrespective of whether the property is recovered by way of replevin or otherwise, is destroyed or otherwise damaged, is modified or otherwise altered, or is resalable at its full market price.

**{¶ 93}** "Pursuant to R.C. 2307.60 and 2307.61, there is a civil cause of action for damages that result from a theft offense. Furthermore, R.C. 2307.61(G) specifically indicates that recovery of damages in a civil action for a theft offense does not require a criminal conviction." *CitiMortgage, Inc. v. Rudzik*, 7th Dist. Mahoning No. 13 MA 20, 2014-Ohio-1472, ¶ 2.

**{¶ 94}** R.C. 2307.60 is a broad statute referring to "[a]nyone injured in person or property by a criminal act * * *," whereas R.C. 2307.61 refers   more specifically to "[a] property owner * * *."   R.C. 2307.61 also limits its reach to situations involving willful damage of property or theft, and provides additional potential remedies, including liquidated damages and an award of treble damages.

**{¶ 95}** We agree with the trial court that Kimberly's claim under R.C. 2307.60 would be similar to the claim brought for an accounting and breach of fiduciary duties, as Kimberly might be able to recover damages and attorney fees in either situation.  However, the claims are not necessarily identical.  In addition, the issue remains whether Kimberly could be considered a "property owner" under R.C. 2307.61 for purposes of the more expanded remedy in that statute.

R.C. 2307.61 does not define the term "property owner," but cases that have applied the statute involve persons or entities that have an ownership interest in the property. *See, e.g., Rudzig* at ¶ 5 (claim initiated by property owners against mortgagee); *Winona Holdings, Inc. v. Duffey*, 10th Dist. Franklin No. 13AP-471, 2014-Ohio-519, ¶ 2 (complaint filed by assignee of car dealership that had received check from defendant that was dishonored for insufficient funds); and *Semco, Inc. v. Sims Bros., Inc.*, 3d Dist. Marion No. 9-12-62, 2013-Ohio-4109, ¶ 3-4 (complaint brought by foundry against metal recycler that had purchased metal stolen from foundry).

{¶ 96} Our review of Ohio case law fails to reveal a case in which a beneficiary of a trust has filed an action against a trustee under R.C. 2307.61. As we previously noted, beneficiaries of trusts have only equitable interests in a trust until their interest is vested. However, as we also noted, once Lorraine died, Kimberly obtained a legal interest in the trust property. Thus, under R.C. 2307.61, Kimberly would have been a "property owner" at that time.

{¶ 97} In view of our prior holding regarding Kimberly's ability to bring an action based on misuse of the power of attorney, we also conclude that Kimberly has standing to bring an action under R.C. 2307.60 and R.C. 2307.61. The remedy of a civil action for treble damages for "property owners" who have been deprived of property due to theft is consistent with actions for an accounting and to obtain relief pursuant to a POA. It is also consistent with the ability to bring actions based on an attorney's malicious conduct. Accordingly, we see no reason why R.C. 2307.61 would not apply to the situation before us.

{¶ 98} Based on the preceding discussion, the Third Assignment of Error is sustained.

V.   Alleged Error in Granting Attorney Fees

{¶ 99}   Kimberly's Fourth Assignment of Error states that:

Did the Trial Court Commit Prejudicial Error When It:   A.   Granted Defendant Some Attorney's Fees For the Accounting?   B.   Denied Plaintiff Some Attorney Fees for Discovering the Defalcation?

{¶ 100}      Under this assignment of error, Kimberly contends that the trial court erred in awarding David some attorney fees, and in denying her some attorney fees.  We will consider these matters together, as they are interrelated.

{¶ 101}      In its initial decision, the trial court concluded that it lacked sufficient information to make a reasonable award of attorney fees for either side.  The court, therefore, held another hearing.  After the hearing, the court concluded that David was entitled to charge the revocable trust 60% of the fees he incurred from April 2011 through June 2013.   The amount of the attorney fee award was $46,360.90.   The court based this decision on David's provision of an accounting for the time period after June 2007 that essentially matched the accounting Kimberly presented at trial.   In March 2011, David had also offered to settle the dispute on terms that exceeded the amount awarded at trial.   Consequently, the trial court concluded that Kimberly had pursued lengthy, expensive litigation that resulted in David repaying the revocable trust an amount less than he had offered to pay before litigation ensued.   However, because David's willful misconduct precipitated the litigation, the court discounted David's award by forty percent.   For the same reasons, the court limited Kimberly's attorney fee award to $12,384, which represented her fees and costs up to March 2011, when David offered to settle the case.

{¶ 102}      "When considering an award of attorney fees, Ohio follows the

'American Rule,' under which a prevailing party may not generally recover attorney fees." *Wilson Concrete Products, Inc. v. Baughman*, 2d Dist. Montgomery No. 20069, 2004-Ohio-4696, ¶ 8, citing *Sorin v. Bd. of Edn.*, 46 Ohio St.2d 177, 179, 347 N.E.2d 527 (1976). "However, attorney fees may be allowed if: (1) a statute creates a duty; (2) an enforceable contract provision provides for an award of attorney fees; or (3) the losing party has acted in bad faith." *Wilson* at ¶ 8, citing *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 33-34, 514 N.E.2d 702 (1987), and *Sturm v. Sturm*, 63 Ohio St.3d 671, 675, 590 N.E.2d 1214 (1992).

{¶ 103}    In the case before us, attorney fees were allowed by statute with respect to the administration of the revocable trust.   Specifically, R.C. 5810.04 provides that:

In a judicial proceeding involving the administration of a trust, including a trust that contains a spendthrift provision, the court, as justice and equity may require, may award costs, expenses, and reasonable attorney's fees to any party, to be paid by another party, from the trust that is the subject of the controversy, or from a party's interest in the trust that is the subject of the controversy.

{¶ 104}    Attorney fees would also be permitted regarding the claim for misuse of the power of attorney, which involves the time period prior to June 2007, if the trial court finds that David acted in bad faith. *See Schiavoni v. Roy*, 9th Dist. Medina No. 11CA0108-M, 2012-Ohio-4435, ¶ 32 (which allowed attorney fees in case involving conversion, breach of fiduciary duty, unjust enrichment, and misuse of a power of attorney).

{¶ 105}    We review awards of attorney fees for abuse of discretion. *See, e.g.*, *Brazelton v. Brazelton*, 2d Dist. Montgomery No. 24837, 2012-Ohio-3593, ¶ 10, and *Innovative*

*Technologies Corp. v. Advanced Mgt. Technology, Inc.*, 2d Dist. Montgomery No. 23819, 2011-Ohio-5544, ¶ 131. "An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable." *Brazelton* at ¶ 10. (Citations omitted.)

{¶ 106} In view of this somewhat deferential standard, we would normally overrule Kimberly's challenge to the attorney fee awards, because the record supports the trial court's decision about David's offer to settle the accounting case in March 2011. However, because the trial court erred with respect to its conclusions regarding the alleged misuse of the power of attorney and with respect to Kimberly's entitlement to bring a civil action under R.C. 2307.60 and R.C. 2307.61, the attorney fee award must be reversed. The litigation after March 2011 involved these claims as well as the claim that David had improperly administered trust assets. As a result, if the trial court finds that David acted in bad faith with respect to the power of attorney, Kimberly may be entitled to more attorney fees, and David may be entitled to less attorney fees. This is a decision for the trial court to make in the first instance, on remand.

{¶ 107} Based on the preceding discussion, the Fourth Assignment of Error is sustained. The awards of attorney fees will be reversed, and this cause will be remanded for further proceedings.

VI. Conclusion

{¶ 108} Kimberly's First Assignment of Error having been overruled, her Second Assignment of Error having been overruled in part and sustained in part, and her Third and Fourth Assignments of Error having been sustained, the judgment of the trial court is affirmed in part, reversed in part, and remanded to the trial court for further proceedings.

. . . . . . . . . . . . .

FAIN and DONOVAN, JJ., concur.

Copies mailed to:

James R. Kingsley
Timothy A. Tepe
Hon. Michael Tucker