[Cite as *Thevenin v. Day-Air Credit Union, Inc.*, 2025-Ohio-1488.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| LAWRENCE THEVENIN,<br>ADMINISTRATOR OF THE ESTATE<br>OF MARVIN THEVENIN | : | |
| | : | |
| | : | C.A. No. 30220 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 MSC 00456 |
| | : | |
| v. | : | (Appeal from Common Pleas Court- |
| | : | Probate Division) |
| DAY-AIR CREDIT UNION, INC. | : | |
| | : | |
| Appellant | | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 25, 2025

. . . . . . . . . . .

STEPHEN D. MILES, Attorney for Appellant

RYAN A. LIDDY, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Day Air Credit Union, Inc. ("Day Air"), appeals from a judgment of the Montgomery County Court of Common Pleas, Probate Division, which, after a bench trial, found it guilty of concealing assets belonging to the estate of Marlin L. Thevenin.

{¶ 2} Day Air claims that it was entitled to employ its extrajudicial right to setoff

against the estate's checking account to pay the decedent's credit card account balance and that it did not have to follow the statutory procedures in R.C. Chapter 2117. It further asserts that the trial court erred in concluding that it lacked a secured interest in the estate's checking account. This appears to be an issue of first impression in Ohio. Neither party has directed us to an Ohio case directly on point, and we have found none. For the following reasons, the trial court's judgment will be reversed.

## I. Facts and Procedural History

{¶ 3} According to the parties' stipulations and agreed evidence, Marlin Thevenin had two credit card accounts with Day Air, which were governed by a Truth-In-Lending Disclosure Statement. The statement included a provision that, as a condition for the issuance of the credit card, Marlin granted Day Air "a consensual security interest in all individual and joint accounts" he had with Day Air "now and in the future to secure repayment of credit extended under this agreement." The statement continued: "You also agree that we have similar statutory lien rights under state and/or federal law. If you are in default, we can apply your shares to the amount you owe." Marlin had one or more individual deposit accounts with Day Air.

{¶ 4} Lawrence Thevenin was appointed as guardian of Marlin's person and his estate on April 18, 2022. In May 2022, Lawrence opened a checking account with Day Air in the name of the guardianship. That checking account was subject to Day Air's Membership and Account Agreement, which provided Day Air a security interest in "all shares and dividends and all deposits and interest" in the account and future accounts "for all obligations you may have now or in the future, except obligations secured by your

principal residence." The agreement further granted Day Air the right of setoff and a statutory lien. The credit card debt was paid monthly from the guardianship account.

{¶ 5} Marlin died on March 9, 2023. Approximately two weeks later, Day Air received notice of his passing and placed a secured hold on the payoff balances for the credit cards. Plaintiff's Motion for Summary Judgment ("MSJ"), Ex. A. Lawrence called Day Air on March 28 and advised that an estate would be opened and that he would oversee the estate. Day Air informed Lawrence of the hold on the account, and he indicated that was fine. Lawrence also agreed to keep automatic fund transfers in place. *Id.*

{¶ 6} On April 19, 2023, approximately six weeks after Marlin's death, Lawrence was appointed as administrator of the estate. On May 2, 2023, he opened a checking account at Day Air in the name of Estate of Marlin L. Thevenin; the account was governed by a Membership and Account Agreement identical to the one associated with the guardianship account. Lawrence deposited a total of $35,790.55 (the balance remaining in the guardianship account) into the estate account. That same day, Day Air placed a secured hold on the available funds in the account. Defendant's MSJ, Contie Aff.

{¶ 7} Between July 5, 2023 and August 28, 2023, Day Air withdrew via automatic payments a total of $864 from the estate's checking account. It also placed a hold in the amount of $9,688.77 on the account. On August 15, counsel for the estate sent a cease-and-desist letter to Day Air, asking the credit union to immediately stop payments from the estate's checking account to the credit cards and to refund the amount taken. Pl's Response to Def. MSJ, Ex. A. The letter indicated that the estate was insolvent due to

a claim by the Medicaid Estate Recovery Program.   Day Air received the letter on August 29.   Pl.'s MSJ, Ex. A.   Day Air ceased taking payments from the estate's checking account on August 30.

{¶ 8} On September 6, 2023, Day Air filed a claim against the estate for an unknown amount.   A claim for $9,751.19 was filed six days later.   Lawrence, as administrator of the estate, rejected both claims.

{¶ 9} On October 10, 2023, Lawrence filed a complaint against Day Air for concealing, embezzling, or conveying away assets of the estate under R.C. 2109.50.   He alleged that Day Air had unilaterally withdrawn $864 from the estate's checking account and had placed an unauthorized and illegal "hold" on the account.   Day Air denied the allegations and raised several defenses, including that it had a lien on the account and the right of setoff.

{¶ 10} The parties initially filed motions for summary judgment, but the trial court determined that a trial was required pursuant to our ruling in *Williams v. Williams*, 2024-Ohio-758 (2d Dist.) (quasi-criminal nature of an R.C. 2109.50 action required defendant's personal appearance).   The matter proceeded to a bench trial on stipulated facts and agreed exhibits, including "all motions for summary judgment and all responses to the summary judgments and all attachments to those documents."   An employee of Day Air appeared and was prepared to testify, but the parties agreed that she would have testified to everything to which they had agreed.

{¶ 11} On July 3, 2024, the trial court found Day Air guilty of concealing, embezzling, conveying away, or wrongfully possessing assets of the estate.   The court

reasoned that Day Air had been required to file a claim under R.C. 2117.10 and that its exercise of the self-help remedy of offset (or setoff) was contrary to public policy. The court commented, in a footnote, that "Day Air's actions here amounted to turning an unsecured class 10 credit card claim into a secured claim it (mistakenly) believed was subject to a remedy of self-help."

{¶ 12} Day Air appeals from the trial court's judgment, raising eight assignments of error. The assignments of error raise three general questions: (1) did Day Air have a secured lien on the estate's checking account, (2) could Day Air exercise an extrajudicial setoff against the estate account, and (3) was Day Air guilty of concealing or wrongfully possessing the estate's assets under R.C. 2109.50. We will address them in a manner that facilitates our analysis.

## II. Proceedings for Embezzlement or Concealment of Assets

{¶ 13} R.C. 2109.50 permits complaints by any "person interested in the estate . . . against any person suspected of having concealed, embezzled, or conveyed away or of being or having been in the possession of any moneys, personal property, or choses in action of the estate . . . ." *See Cartwright v. Batner*, 2014-Ohio-2995, ¶ 62 (2d Dist.). Upon the filing of a complaint for embezzlement or concealment of assets of an estate, the probate court must "compel the person or persons suspected to appear before it to be examined, on oath, touching the matter of the complaint." R.C. 2109.50.

{¶ 14} When ruling on the complaint, the probate court must determine, by jury verdict or bench trial, whether "the person accused is guilty of having concealed, embezzled, conveyed away, or been in possession of moneys, personal property, or

choses in action of the estate." R.C. 2109.52. With some exceptions, where the person is found guilty, the probate court must render judgment in favor of the fiduciary for the moneys or the value of the personal property concealed, embezzled, conveyed away, or held in possession, plus a ten percent penalty and all costs of the proceedings. *Id.*

{¶ 15} Concealment proceedings under R.C. 2109.50 are considered quasi-criminal. *Williams*, 2024-Ohio-758, ¶ 9 (2d Dist.); *Longworth v. Childers*, 2008-Ohio-4927, ¶ 19 (2d Dist.). To prove a violation, the complainant must show "more than possession of estate assets. If such were the only proof necessary, all questions of disputed title could be brought under the concealment statute thereby making the statutory provisions for declaratory judgment (R.C. 2721.05) and exceptions to the inventory (R.C. 2109.33) superfluous. Further, the estate would be enriched by ten percent of each claim however innocent the possession." *Longworth* at ¶ 19, quoting *Ukrainiec v. Batz*, 24 Ohio App.3d 200, 202 (9th Dist. 1982). Accordingly, a violation of R.C. 2109.50 involves wrongful or culpable conduct on the part of the person accused. *Id.* at ¶ 20.

### III. Creditor Claims Against an Estate

{¶ 16} We begin with a brief review of the statutory scheme for the presentment of creditor claims against a decedent's estate.

{¶ 17} R.C. 2117.06 requires "[a]ll creditors having claims against an estate, including claims arising out of contract, out of tort, on cognovit notes, or on judgments, whether due or not due, secured or unsecured, liquidated or unliquidated" to present their claims within six months of the decedent's death. R.C. 2117.06(A), (B). The

presentment requirements in R.C. 2117.06 apply to "claims which may be allowed as debts payable out of the assets of an estate." *Embassy Healthcare v. Bell*, 2018-Ohio-4912, ¶ 28, quoting *Lewis v. Steinreich*, 73 Ohio St.3d 299, 302 (1995). The Ohio Supreme Court has stated that "[a] creditor with an enforceable claim against a decedent cannot opt out of the requirements of R.C. 2117.06" and must present a timely claim to the estate. *Id.* at ¶ 32. However, in addressing the dissent's concern regarding the apparently sweeping nature of the *Embassy Healthcare* holding, the supreme court indicated that the holding was limited to the factual circumstances before it: "a necessaries creditor with a contractual claim against a decedent – a claim that became the obligation of the estate upon the decedent's death." *Id.* at ¶ 33.

{¶ 18} When a claim is presented, the executor may require satisfactory written proof in support of it along with an affidavit of the claimant that "the claim is justly due, that no payments have been made on the claim, and that there are no counterclaims against it to the claimant's knowledge. The affidavit shall set forth any security held for the payment of the claim and, if the claim is not due, the date of maturity." R.C. 2117.08. The executor generally has 30 days to reject or approve the claim. R.C. 2117.06(D). If the claim is rejected, the claimant must file an action on the claim within two months or the claim is barred. R.C. 2117.12.

{¶ 19} R.C. 2117.25 establishes the order in which debts of a decedent are paid: (1) costs and expenses of administration; (2) funeral expenses up to $4,000; (3) the allowance for support made to the surviving spouse, minor children, or both; (4) debts entitled to a preference under the laws of the United States; (5) expenses of the last

sickness of the decedent; (6) up to $2,000 of additional funeral expenses; (7) expenses of the decedent's last continuous stay in a nursing home; (8) personal property taxes, claims made under the Medicaid estate recovery, and obligations for which the decedent was personally liable to the state or any of its subdivisions; (9) debts for manual labor performed for the decedent within the 12 months preceding the decedent's death, not exceeding $300 to any one person; and (10) other debts for which claims have been presented and finally allowed. R.C. 2117.25(A). No payments may be made to creditors of one class until all those of the preceding class are fully paid or provided for. R.C. 2117.25(E).

{¶ 20} R.C. 2117.10 provides an exception to R.C. 2117.06's presentment requirement for certain lienholders. Under that statute, a lienholder's failure to present its claim will not affect the lien "if the same is evidenced by a document admitted to public record, or is evidenced by actual possession of the real or personal property that is subject to the lien." R.C. 2117.10. R.C. 2117.10 is an exception to the time limitation in R.C. 2117.06(B) and "serves to preserve valid liens – those evidenced by public record or possession of the asset – without regard to whether they are timely presented." *First Union-Lehman Bros.-Bank of Am. Commercial Mtge. Trust v. Pillar Real Estate Advisors, Inc.*, 2014-Ohio-1105, ¶ 22 (2d Dist.). R.C. 2117.10 does not apply to equitable liens. *Id.* at ¶ 25, citing *Kuhnle v. Rusmisel*, 113 Ohio App. 389, 391 (2d Dist.1960).

### IV. Bank/Credit Union's Right to Setoff

{¶ 21} Day Air claims that it was not required to submit its claim to the statutory probate process, because it was entitled to employ the right of setoff.

{¶ 22} "Setoff" is the right of two parties, "each of whom under an independent contract owes a definite amount to the other, to set off their respective debts by way of mutual deduction." *Walter v. Natl. City Bank of Cleveland*, 42 Ohio St.2d 524, 525 (1975), citing *Witham v. South Side Bldg. & Loan Assn. of Lima*, 133 Ohio St. 560, 562 (1938). It is "rooted in the ancient common law." *Daugherty v. Cent. Trust Co. of Northeastern Ohio*, 28 Ohio St.3d 441, 446 (1986).

{¶ 23} The general right of setoff is codified in the cross-demand statute, R.C. 2309.19, which states: "When cross demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim could have been set up, neither can be deprived of the benefit thereof by assignment by the other, or by his death. The two demands must be deemed compensated so far as they equal each other." Application of the cross-demand statute is generally defensive, allowing a plaintiff's claim to be offset to the extent that the defendant has a countervailing claim against the plaintiff; if the defendant's claim exceeds the plaintiff's, the defendant may not obtain affirmative relief for the balance of the claim. However, the right to assert a cross-demand exists even when the claim could not be raised due to the expiration of a statute of limitations, *see Riley v. Montgomery*, 11 Ohio St.3d 75 (1984), or the failure to file a claim under R.C. 2117.06, *see Eaver v. McGinnis*, 41 Ohio App.3d 153 (9th Dist. 1987).

{¶ 24} The unique bank/customer relationship (or, in this case, credit union/member relationship) has created an enhanced right to setoff in the banking context. The relationship between a bank/credit union and its customer/member

(depositor) is one of debtor and creditor. *Bank of Marysville v. Windisch-Muhlhauser Brewing Co.*, 50 Ohio St. 151 (1893); *Burhill Leasing Corp. v. Graham*, 2022-Ohio-3757, ¶ 48 (2d Dist.). "[M]oney deposited in a bank becomes the property of the bank and is available for use by the bank in its business. The depositor becomes a creditor of the bank in the amount of the deposit with the right to have this debt repaid in whole or in part on demand," subject to the terms of the depositary agreement between them. (Citations omitted.) *Id.*

{¶ 25} A bank/credit union and its customer/member may also hold the reverse roles of creditor and borrower when the bank/credit union lends money. R.C. 1733.25(A) specifically authorizes a credit union to make loans or other extensions of credit to its members for provident and productive purposes. This may take various forms, including, for example, credit cards, personal loans, auto loans, mortgage loans, and lines of credit. A credit union may accept security for its loans or extensions of credit. R.C. 1733.25(D).

{¶ 26} R.C. 1733.25 creates a statutory lien on credit union members' accounts. The statute provides that, with the exception of individual retirement accounts and other accounts established under the Internal Revenue Code, a credit union "has a lien on the membership share, shares, deposits, and accumulated dividends and interest of a member in an individual, joint, trust, or payable on death account for any obligation owed to the credit union by that member." R.C. 1733.25(E)(1). "A credit union may refuse to allow withdrawals from any share or deposit account by a member while the member has any outstanding obligation to the credit union." R.C. 1733.25(E)(2).

{¶ 27} "Bank setoff is an extrajudicial self-help remedy based on general principles

of equity. It allows a bank to apply general deposits of a depositor against a depositor's matured debt. Courts have found that this right arises from the contractual debtor-creditor relationship created between depositor and bank when an account is opened." *Daugherty*, 28 Ohio St.3d 441, 446; *Moyer v. Abbey Credit Union, Inc.*, 2020-Ohio-5410, ¶ 20 (2d Dist.). "Setoff is not strictly limited by statute, and the courts can allow setoff upon equitable principles where necessary to prevent clear injustice." *Walter*, 42 Ohio St.2d 524, at paragraph one of the syllabus.

{¶ 28} The Ohio Supreme Court has recognized that "the exercise of setoff by a bank is often quite different from the case of a usual debtor-creditor relationship," noting that setoff "permits the bank by self-help to take priority over others claiming a right to the funds on deposit." *Id.* at 526. "[S]etoff becomes a means by which the bank, because of its position as a commercial middleman, acquires a priority of right whenever it acts as creditor for a depositor." *Id.* at 527.

{¶ 29} Although Article 9 of the Uniform Commercial Code (UCC) does not generally apply to the right of setoff, it has provisions related to deposit accounts (R.C. 1309.340) and account debtors (R.C. 1309.404). R.C. 1309.109(D)(10). It provides that, with a limited exception, a bank may exercise its right of setoff against a secured party with a security interest in the deposit account. R.C. 1309.340(A). The UCC thus gives banks higher priority over other secured creditors in a deposit account. Moreover, the UCC makes clear that "a bank may hold both a right of set-off against, and an Article 9 security interest in, the same deposit account." Official Comment 3 (2000) (discussing R.C. 1309.340(B)).

{¶ 30} "[T]hree conditions must be satisfied before a bank may set off a customer's deposits against the customer's indebtedness to the bank: (1) the existence of mutuality of obligation, (2) the debtor's ownership of the funds used for setoff, and (3) the ripeness of the existing indebtedness for collection at the time of the setoff."  *Moyer,* 2020-Ohio-5410, ¶ 21 (2d Dist.), quoting *Citizens Fed. Bank, FSB v. Zierolf*, 119 Ohio App.3d 46, 49 (2d Dist. 1997).

### V. Mutuality of Obligations

{¶ 31} The estate contends that Day Air's right to setoff terminated when the funds were deposited into the estate account.  According to the estate, the fiduciary of an estate and the decedent are not considered the same person and, therefore, debts due from a decedent in his lifetime cannot be set off against claims by the administrator of a decedent's estate.  The estate thus argues that setoff from the estate account was improper due to lack of mutuality of obligation.

{¶ 32} The estate relies on *Epinger v. Wade*, 73 Ohio App. 231 (9th Dist. 1943), *aff'd,* 142 Ohio St.2d 146 (1944), which held that mutuality for purposes of setoff and counterclaims requires mutuality of both the person and capacity in which the person is acting.  In that case, mutuality did not exist where the administrator's wrongful death claim arising out of a car crash was for the benefit of the surviving spouse and next of kin, but the counterclaim was against the estate for the defendant's personal injuries caused in the crash.  Mutuality was lacking because the estate was acting in one capacity as plaintiff and a different capacity as counterclaim-defendant.  The Ohio Supreme Court noted in its review that mutuality of parties and claims would have existed "if plaintiff's

action had been one for the benefit of decedent's estate to recover for personal injuries suffered by the decedent in his lifetime." *Id.* at 464.

**{¶ 33}** *Epinger* reaffirms that setoff does not apply where one party is acting in different capacities for the competing claims. While *Epinger* involved a party acting in different representative capacities, a more common example of this principle is that a claim by a person in a representative capacity cannot be setoff against a debt owed by that person in a personal capacity. *See, e.g., Smith v. Olympic Bank*, 103 Wash.2d 418, 423 (1985) (bank would not have been permitted to use funds in guardianship account to setoff obligation on guardian's personal loan with bank). *Epinger* further illustrates that the administrator or executor of an estate can and does wear multiple hats, and therefore mutuality depends on the capacity in which an administrator or executor is acting.

**{¶ 34}** We do not agree with the estate that mutuality necessarily terminates upon the death of the debtor-account holder. While this may be a question of first impression in Ohio, it is not elsewhere. Other jurisdictions have held that a bank does not lose its right to setoff by allowing transfer of money from decedent's account to an account in the name of the estate. Rather, "[i]t is generally recognized that a bank has the right to appropriate a deposit to a debt owed to it by the depositor, and that this right of appropriation or setoff is not affected by the depositor's death, but continues to exist and may be enforced against his personal representative." 7 A.L.R.3d 908 (originally published in 1966) (citing numerous cases).

**{¶ 35}** For example, in *Ohio Valley Natl. Bank of Henderson v. Edwards*, 492 S.W.2d 195, 197 (Ky.Ct.App. 1973), Edwards died owing the bank on two notes with a

face value of $21,500; he had approximately $9,700 on deposit with the bank. Shortly after his death, the bank allowed his widow to draw a check transferring the funds to a new account in her name as executor. The bank, at that time, believed the estate would be solvent. Two weeks later, it filed a claim against the estate, noting there was no "offset." When the estate proved to be insolvent and the matter was referred to a master commissioner to settle the accounts, the bank asserted its right to setoff. The parties agreed that the bank had the right of setoff at the time of Edwards' death; they disputed whether the bank lost that right due to subsequent events.

**{¶ 36}** The appellate court concluded that the bank had not lost its right to setoff. The court first stated that a bank does not lose its right to setoff by allowing the transfer of money from decedent's account to an account in the name of the estate and in allowing checks to be drawn on the new account. *Id.* at 197, citing *Camden Natl. Bank v. Green*, 45 N.J.Eq. 546, 17 A. 689 (1889) and *Ames Trust & Sav. Bank v. Reichardt*, 254 Iowa 1272, 121 N.W.2d 200 (1963). It further concluded that other creditors had not altered their positions, to their detriment, due to the bank's delay in asserting its right to setoff. Consequently, the equities did not shift to the other creditors' favor, and setoff was allowed.

**{¶ 37}** The circumstances in *Edwards* are distinguishable from those in *In re Estate of Johnson*, 240 N.J.Super. 134 (1990), in which the right to setoff did not exist at the time of death. In that case, Johnson executed a demand note for $80,000 to Central Jersey Bank and Trust Company, and it remained unpaid when he died. After being appointed, the executor of Johnson's estate opened a checking account with Central Jersey Bank.

After Central Jersey Bank obtained a judgment on the unpaid note, it set off the balance in the estate's checking account in partial satisfaction of the judgment. The executor filed suit alleging, in part, that the setoff was invalid.

{¶ 38} The New Jersey appellate court agreed with the executor. The court initially noted that "there should be identity of parties to both claims, and the second, that where insolvency or death of one original party has intervened, the set-off is applicable to the situation existing at and immediately before such insolvency or death." *Id.* at 138, quoting *Kanter v. Sec. Trust Co.*, 110 N.J.L. 361, 362 (Sup.Ct. 1933). Because the decedent had no bank account balance when he died, there was nothing to which the bank's right of setoff would have attached. The court further held that the bank also could not attach the deposit made later by the executor, reasoning that the executor "was not the testator, but a trustee for his creditors and the beneficiaries under his will. The interest of those creditors and beneficiaries in the assets of the estate vested some days before any deposit was made." The court thus held that the bank "was not entitled to priority over other creditors in a fund created and entrusted to it for the benefit of all, and subsequent to the death of its debtor." *Id.*, quoting *Kanter* at 363. *See also In re Greenwald's Estate*, 143 N.Y.S.2d 464, 466 (N.Y.Sur.1955) (bank could not assert right to setoff against subsequently opened estate account at creditor-bank with different funds).

{¶ 39} We also find *State ex rel. Eure v. Lawrence*, 378 S.E.2d 207 (N.C.App. 1989), to be instructive as to the right of setoff when the debtor's accounts come under the control of another. *Lawrence* involved a bank's right to employ its right to setoff after

the appointment of a receiver to preserve and manage the assets of the defendants (Lawrence and various corporations alleged to have violated securities laws). When the receiver was appointed, Lawrence had multiple loans with First Bank with outstanding balances totaling approximately $113,000, and he had $118,994 on deposit with First Bank. Over eight months, the receiver deposited approximately $28,000 into Lawrence's checking account, the bank paid interest on the account, and the bank honored checks drawn on the account in accordance with its agreement with the receiver. By August 11, 1987, Lawrence's checking account balance had declined to $58,680. On that date, First Bank set off $58,680 in Lawrence's bank account to cover outstanding debts to the bank. After a motion by the receiver, the trial court ordered First Bank to return the amount of the setoff to the receiver, plus interest.

{¶ 40} The North Carolina appellate court reversed, holding that the bank could exercise its setoff rights. Initially, the court stated that the relationship between Lawrence and First Bank was one in which he was the bank's creditor for the amount deposited in his accounts, and the bank was his debtor, but Lawrence was also a debtor of First Bank on various loans and guarantees. The bank's setoff rights were based in equity and on the terms of the promissory notes signed by Lawrence.

{¶ 41} When considering whether the bank's right to setoff was lost because there was no mutuality between the receiver as legal owner of the deposits and the bank as Lawrence's creditor, the appellate court concluded that mutuality had not been lost. It noted that the receiver "takes the property of the insolvent debtor subject to mortgages, judgments, and other liens existing at the time of his appointment." *Id.* at 450, quoting

*Natl. Surety Corp. v. Sharpe*, 236 N.C. 35, 50 (1952). The court held that the appointment of the receiver did not nullify the mutual obligation between the bank and Lawrence. *Id.*

**{¶ 42}** Next, the court considered whether the bank waived its setoff rights by accepting deposits and honoring checks. In concluding that the bank did not, the court adopted the reasoning in *Killette v. Raemell's Sewing Apparel, Inc.*, 93 N.C.App. 162 (N.C.App.1989), which stated:

> Nor did the bank waive its setoff right by honoring some of the company's checks after the note became due. A waiver is an intentional and permanent relinquishment of a known right . . . that usually must be manifested in a clear and unequivocal manner. The law does not discourage leniency to one's debtors, and in our opinion the mere honoring of a depositor's checks after its note is due manifests only an intention by the bank to accommodate the depositor at that time; it does not indicate an intent to continue doing so in the future. If such indulgences were held to be a permanent waiver of the right of setoff it could only encourage banks to immediately offset their matured notes against the checking account balances of their depositor-debtors, a practice bound to embarrass if not ruin many hard pressed debtors.

*Id.* at 164.

**{¶ 43}** Finally, the North Carolina court turned to how much the bank was entitled to set off. It noted that "if a bank actually knows that sums deposited in the account of

one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to it." *Lawrence* at 451, quoting Annotation, Bank's Right to Apply Third Person's Funds, Deposited in Debtor's Name, On Debtor's Obligation, 8 ALR 3d 235, 238-39. With the facts before it, the court determined that the bank was entitled to set off the $58,680 that was owed.

{¶ 44} Although the common law on setoff is extensive and it can be hard to generalize, we discern from these and other cases that when an account holder with a debt (such as Marlin) dies, the financial institution's right to setoff should be determined by considering the circumstances at and immediately before death. If the right to setoff existed at the time of death, the death of the account holder/debtor does not alter the right to setoff. However, the right is not unlimited: setoff is permissible against an estate account only if the funds were moved from the decedent's account with that creditor-bank directly to an estate account with the same creditor-bank and only to the amount of the fund balance at the time of death. Mutuality does not exist where the administrator opens an estate deposit account at a bank or credit union where the decedent has an existing debt, but the decedent had no existing deposit account at the time of death; in this circumstance, the administrator is not acting solely as a substitute for the decedent when opening the account, defeating mutuality.

{¶ 45} Marlin had both deposit and credit card accounts with Day Air. There appears to be no dispute that there was mutuality of obligation while his individual account and credit card accounts were open.

{¶ 46} Mutuality was not affected by the opening of the guardianship checking

account. In his response to Day Air's motion for summary judgment, Lawrence noted that for an asset to belong to a probate estate, title to the asset had to rest in the decedent at the time of death. Lawrence thus claimed that Marlin had title to the guardianship checking account. Lawrence emphasized that he was appointed guardian to take care of the person or property of *another*, i.e. Marlin, and that he opened the guardianship checking account in the name of the Guardianship of Marlin L. Thevenin for that purpose. Pl.'s Memo. in Opposition to Day Air's MSJ, 5-6.

{¶ 47} As guardian of Marlin's estate, Lawrence was responsible for paying "all just debts due from the ward out of the estate in the possession or under the control of the guardian." R.C. 2111.14(A)(3). The parties' evidence indicates – and Lawrence acknowledged in his motion for summary judgment – that Marlin's credit card debt was being paid through automatic withdrawals from the Day Air guardianship account during the guardianship.

{¶ 48} The parties dispute whether mutuality of obligations existed between Day Air and the estate account. Based on the foregoing authority, we concluded that it did. When Marlin died, he had a pending credit card balance of close to $10,000. The guardianship account had a balance of approximately $35,000. At that time, Day Air had the right to employ its right to setoff to the extent that Marlin's debt was due and to freeze his account up to the amount of his credit card debt to protect its security interest. Because the money from the guardianship account was deposited into an estate account with Day Air, Day Air's right to setoff followed. Under these circumstances, mutuality of obligations continued to exist after the guardianship funds were placed in the estate

account.

## VI. Day Air's Interest in the Day Air Accounts

{¶ 49} The parties further dispute the extent to which Day Air obtained an interest in the estate account due to Day Air's Membership Agreement and other account documents.

{¶ 50} The parties agree that Marlin had an individual bank account with Day Air. He also opened two credit accounts with Day Air, both of which were subject to the Truth-In-Lending Disclosure Statement. At that time, Marlin granted Day Air "a consensual security interest in all individual and joint accounts" he had with Day Air "now and in the future to secure repayment of credit extended under this agreement." He also agreed that Day Air had "similar statutory lien rights under state and/or federal law" and that, upon default, Day Air could "apply your shares to the amount you owe." Day Air was thus given a statutory and contractual lien on the shares in Marlin's individual accounts.

{¶ 51} Lawrence then opened a guardianship checking account with Day Air. The Membership and Account Agreement set forth the terms of the relationship between Day Air and its members regarding their accounts. Paragraph 2 discussed individual accounts. It stated:

> 2. INDIVIDUAL ACCOUNTS – An individual account is owned by one member who has qualified for credit union membership. If the account owner dies, the interest passes, subject to applicable law, to the account owner's estate or Payable on Death (POD) beneficiary/payee or trust beneficiary, *subject to . . . any security interest or pledge granted by an*

*account owner, and our statutory lien rights.*

(Emphasis added.)

**{¶ 52}** Paragraph 20 specifically addressed Day Air's right to setoff and its statutory lien. That paragraph read:

**20. PLEDGE, RIGHT OF OFFSET AND STATUTORY LIEN –** Unless prohibited by law, you pledge and grant as security for all obligations you may have now or in the future, except obligations secured by your principal residence, all shares and dividends and all deposits and interest, if any, in all accounts you have with us now and in the future. If you pledge a specific dollar amount in your account(s) for a loan, we will freeze the funds in your account(s) to the extent of the outstanding balance of the loan or, if greater, the amount of the pledge if the loan is a revolving loan. Otherwise, funds in your pledged account(s) may be withdrawn unless you are in default. You agree we have the right to offset funds in any of your accounts against the obligation owed to us. Federal or state law (depending upon whether we have a federal or state charter) gives us a lien on all shares and dividends and all deposits and interest, if any, in accounts you have with us now and in the future. Except as limited by federal or state law, the statutory lien gives us the right to apply the balance of all your accounts to any obligation on which you are in default. After you are in default, we may exercise our statutory lien rights without further notice to you.

Your pledge and our statutory lien rights will allow us to apply the funds in

your account(s) to what you owe when you are in default, except as limited by federal or state law**.** If we do not apply or offset the funds in your account(s) to satisfy your obligation, we may place an administrative freeze on your account(s) in order to protect our statutory lien rights and may apply or offset the funds in your account(s) to the amount you owe us at a later time . . . By not enforcing our right to apply or offset funds in your account(s) to your obligations that are in default, we do not waive our right to enforce those rights at a later time.

**{¶ 53}** Lawrence acknowledges that Marlin retained title to his funds when Lawrence opened the guardianship checking account and placed the funds from Marlin's individual account into the guardianship account. Based on the Truth-In-Lending Disclosure and the Member Agreement, Day Air obtained a contractual security interest in the funds in the guardianship account to the extent of Marlin's credit card balances. *See Lawrence*, 378 S.E.2d 207 (N.C.App.). Accordingly, based on its previous relationship with Marlin, any lien that Day Air had on the funds in Marlin's individual account transferred with it. *See id.* Moreover, Day Air obtained a statutory lien over the funds in the guardianship account for any obligation Marlin owed to the credit union. *See* R.C. 1733.25(E).

**{¶ 54}** Day Air's security interest was perfected by its control over the deposit accounts. A security interest in deposit accounts may be perfected by control of the collateral under R.C. 1309.104. *See* R.C. 1309.314(A). Under R.C. 1309.104(A)(1), a secured party has control of a deposit account if the secured party is the bank with which

the deposit account is maintained. The bank has control of a deposit account even if the debtor retains the right to direct the disposition of funds from the deposit account. R.C. 1309.104(B). As stated in the 2000 Official Comments:

> Under subsection (a)(1), the bank with which the deposit account is maintained has control. The effect of this provision is to afford the bank automatic perfection. No other form of public notice is necessary; all actual and potential creditors of the debtor are always on notice that the bank with which the debtor's deposit account is maintained may assert a claim against the deposit account.

Accordingly, under these statutes, Day Air's security interest in the guardianship deposit account was perfected by its control over that account.

{¶ 55} Lawrence asserts that the estate took funds free and clear of any security interest Day Air may have had due to R.C. 1309.332(B), which states: "A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Lawrence argues that there is no allegation of collusion here, so the estate took the guardianship funds free of any security interest.

{¶ 56} We recognized that R.C. 1309.332 creates broad protection for transferees to ensure that security interests in deposit accounts do not impair the free flow of funds. *See* R.C. 1309.332, Official Comment 3; *Cortland Savs. & Banking Co. v. Platinum Rapid Funding Group, Ltd.*, 2021-Ohio-4615 (11th Dist.). However, we disagree that R.C. 1309.332(B) operates to remove Day Air's lien. In this case, Lawrence, while Marlin's

guardian, was the representative of the debtor, and he was also the representative of the transferee, the estate.   Under the Membership Agreement for the guardianship account, Lawrence agreed that, upon the death of the account owner, the interest in the account would transfer to the owner's estate, subject to Day Air's security interest.   Under these circumstances, it defies logic that Lawrence could defeat the security interest in the guardianship account through his unilateral action of transferring money from the guardianship account to the estate account.

{¶ 57} We do agree with Lawrence that Day Air did not obtain a secured interest in the entire estate account by virtue of the Membership Agreement associated with the estate account.   In opening the estate account, Lawrence was performing his broader responsibility to collect the assets of the deceased and preserve them for distribution, not just acting as a representative of the deceased.   In the absence of a new debt incurred by Lawrence as administrator of the estate, Day Air's secured interest in the estate account was limited to the amount of the funds transferred from the guardianship account.

### VII. Day Air's Right to Exercise Extrajudicial Setoff

{¶ 58} We therefore turn to whether Day Air was entitled to employ its extrajudicial right to setoff against the estate's checking account.   We conclude that it was.

{¶ 59} There was mutuality of obligations between Day Air and the estate, and the estate had ownership of the funds used for setoff.   Day Air asserts that the credit card debt was ripe for collection at the time of the setoff, and the estate makes no argument to the contrary.   Because this right of setoff is extrajudicial, the credit union was not required to seek payment through the probate process.

{¶ 60} The estate argues that, even if setoff could apply, we should disallow it on equitable principles. While not binding on us, the Fifth District has identified eight factors that affect the equities of setoff: (1) insolvency of the estate; (2) the class of creditors prejudiced by setoff; (3) the nature of the asset/savings account; (4) the terms of the savings account; (5) failure of the bank to secure extension of credit (bank checks) by pledge of savings account; (6) the debt of the decedent was "mature" when incurred; (7) fraud or criminal conduct of the decedent; and (8) the time of attempted setoff. *Hughes v. Alliance Fed. S. & L. Assn.*, 1982 WL 5620, *2 (5th Dist. Dec. 21, 1982).

{¶ 61} In addition to its equitable lien from the mutual debtor/creditor relationship, Day Air had a contractual and statutory lien on the funds in Marlin's account to secure payment of his credit card debt. The lien was perfected by Day Air's control over his bank account, giving Day Air an elevated interest in the account over other creditors. The liens and mutuality of obligations carried over to the estate account after Marlin's death.

{¶ 62} Although courts are divided on the effect of insolvency on the right to setoff against an estate, *see, e.g., Hughes* at *2, the majority view is that "a bank may setoff a deceased customer's general deposits against the customer's unmatured debt if the estate is insolvent." *Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609, 620 (Tex.1992) (citing numerous cases). The rationale for that rule is that "insolvency renders all debts due, and furnishes, of itself, a sufficient ground for set-off." *Id.*, quoting *Norris v. Commercial Natl. Bank*, 231 Ala. 204 (1935). In this case, the record suggests that Marlin's estate was insolvent due to the Medicaid recovery claim; there is no evidence

that the estate had insufficient funds to pay administrative and funeral costs. By exercising its right to setoff, Day Air was paid prior to other creditors, but this was a position it held prior to Marlin's death. Moreover, bank setoff has been permitted even when its exercise may cause a hardship to others. *See Daugherty,* 28 Ohio St.3d 441.

{¶ 63} While not directly on point, our conclusion is supported by *Jamison v. Soc. Natl. Bank*, 66 Ohio St.3d 201 (1993). In that case, Harold Horton purchased a certificate of deposit ("C.D.") and designated it as payable on death ("P.O.D.") to his beneficiary, Pricy Ann Jamison. Horton subsequently borrowed money from the bank, executing a security agreement and promissory note by which he pledged the P.O.D. C.D. as collateral for the loan. Horton died with the loan outstanding. Jamison subsequently notified the bank of his death and requested payment of the P.O.D. C.D. The bank refused and applied approximately $5,000 of the proceeds from the C.D. in satisfaction of the note. Jamison sued, claiming that the bank had wrongfully taken funds from the P.O.D. C.D. because, at the time of death, her interest in the C.D. vested and she was entitled to the full amount.

{¶ 64} On review, the Ohio Supreme Court held that "where a lifetime owner of a P.O.D. C.D. signs a demand note and security agreement pledging the certificate to a bank as collateral for a loan, then dies with the loan outstanding, the bank has an immediate right to satisfy the debt from the proceeds of the P.O.D. C.D. without first seeking payment from the decedent's estate, and the beneficiary of the P.O.D. C.D. is entitled only to the surplus." *Id.* at 203 and paragraph one of the syllabus. The supreme court explained that the interest Jamison received upon Horton's death could be no more

than that owned by Horton during his lifetime. *Id.* at 205. "Therefore, Jamison could receive only an encumbered interest in the P.O.D. C.D. and, since decedent's estate had failed to make payments on the loan after decedent's death, the bank was entitled to exercise its right of setoff, paying only the surplus amount in the account to Jamison." *Id.*

{¶ 65} Jamison further contended that the bank had not perfected its security interest in the P.O.D. C.D. and, thus, its interest did not take priority over hers. The Court held that the bank's possession of the P.O.D. C.D., alone, perfected its security interest. *Id.* at 207. However, it further noted that, "even if the bank should have filed a security agreement in order to perfect its interest in the P.O.D. C.D., the bank still had a common-law right of setoff, pursuant to the terms of the note, which would have allowed the bank to apply the proceeds of the P.O.D. C.D. against decedent's indebtedness." *Id.*, citing *Walter*, 42 Ohio St.2d 524, paragraph three of the syllabus.

{¶ 66} We recognize that *Jamison* is distinguishable in many respects. The loan at issue was a demand note that was due upon Horton's death. In addition, the property at issue was a P.O.D. C.D., and the dispute was between the bank and a third-party, the estate. Nevertheless, Jamison reinforces the bank's general right to setoff and illustrates a circumstance where the bank could employ that right to obtain satisfaction of the decedent's debt rather than following the claim process established in the probate code.

{¶ 67} We therefore hold that the trial court erred in concluding that Day Air wrongfully exercised setoff against the estate account at Day Air and, consequently, in finding the credit union guilty under R.C. 2109.50. Even if we agreed with Lawrence that

the setoff was improper, we would conclude that the trial court erred in finding Day Air guilty under R.C. 2109.50.   The law regarding setoff is complicated, and a finding of guilt under R.C. 2109.50 is not appropriate where there are reasonable competing claims to ownership of the property.

{¶ 68} Day Air's assignments of error are sustained.

### VIII. Conclusion

{¶ 69} The trial court's judgment will be reversed.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.